(Decided 27th January, 1881.)

WASHINGTON BOOTH, JOSEPH W. JENKINS, D. J. FOLEY & BRO., and others *vs.* JOHN M. ROBINSON, SAMUEL M. SHOEMAKER, THE BALTIMORE STEAM PACKET COMPANY, THE POWHATAN STEAMBOAT COMPANY, and others.

*Personal Responsibility of Directors of a Corporation—Transactions between Corporations where Directors in the one are Directors in the other—Form of Proceeding on the part of Stockholders to call Directors to an Account—Evidence—Powers of a Corporation—An absolute Bill of Sale intended as a Mortgage.*

In proceedings in equity by shareholders of the stock of a corporation, for the purpose of obtaining redress for what was alleged in the bill, to have been their loss in the value of their shares of stock, by reason of certain wilful and fraudulent mismanagement of the affairs of the corporation by some of its directors, (against whom and the corporation itself, and another corporation, of which they

Booth, *et al. vs.* Robinson, *et al.*

were also directors, and in whose interest it was alleged, they had so acted, the bill was filed)—to accomplish objects and purposes adverse to the interest of the stockholders of the corporation first mentioned, it was HELD:

That to render the directors personally liable for alleged injuries occasioned by conduct wilfully fraudulent, in intent and purpose, amounting to breaches of trust, the proof in support of the allegations must be other than mere constructive fraud or breaches of trust; that there must be affirmative proof of the misconduct charged, going to establish the fraud in fact.

In equity, directors of a corporation are personally liable for the consequences of frauds or malfeasance they may be guilty of, or for such gross negligence as may amount to a breach of trust, to the damage of the corporation or its stockholders; but they are not liable for the consequences of unwise or indiscreet management, if their conduct is entirely due to mere default or mistakes of judgment. And the *onus* of proof of fraud, combination or gross negligence, to render directors personally liable, is upon the party making the charges; which must be distinctly made, and fully supported by proof.

There is no legal presumption of illegality or unfairness, in transactions between two corporations, from the mere fact, that a portion of the board of directors in the one company constitute a part of the board of directors in the other at the same time, and participated in the dealings between the two corporations. It is only when their dealings are shown to be prejudicial to the one or other of the corporations represented by them, that their conduct will be subject to a strict and severe scrutiny by the Courts.

The corporation is the proper and primary party to call the directors to an account in a Court of equity for fraud or breaches of trust in the management of its affairs. To enable a shareholder, either for himself alone, or for himself and others, to maintain a bill against directors for such fraud or breaches of trust, he must allege and show not only the violations of duty or breaches of trust on the part of the directors, but that he as stockholder has been damnified thereby, and that the corporation has failed or refused to take the proper legal steps for the redress of the wrong. But if on a bill filed by stockholders, the proof should sustain its allegations, that a majority of the shares of the corporation are owned by another alleged rival company, and that a majority of the directors of the alleged fraudulently managed corporation are adverse to the

Booth, *et al. vs.* Robinson, *et al.*

interest of the complainants, and are combined against them, and would by means of the control that they exercise, frustrate and defeat any attempt to induce the corporation to take action for the redress of the wrongs alleged; such facts would be a sufficient excuse for not making or alleging a formal demand upon the corporation to take action, especially where the rival company and the alleged fraudulently managed corporation are both made defendants.

A corporation may invest in the stock of other corporations as well as in any other funds, provided it be done *bona fide* and with no sinister or unlawful purpose, and there be nothing in its charter or in the nature of its business that forbids it.

Corporations, like individuals, may borrow money for the conduct of their affairs, without express authority therefor, whenever the nature of their business may render it proper or expedient. And the power to borrow carries with it very generally, unless expressly restrained, the power to secure the loan by mortgage. If there is no such express power found in the charter of a corporation, but power is conferred on its directors to make all necessary contracts, and to sell or otherwise dispose of any portion of its property whenever in their judgment, it should be found to be to the interest of the company, the exercise of the power to borrow and to secure the loan by mortgage from the company would be valid.

In equity, where it appears that while a transaction was made to assume the form of an absolute bill of sale, it was in substance, and according to the understanding and intent of the parties, a mere loan of money, and that the instrument taken, being an absolute bill of sale, was but as security, and therefore a mortgage, any evidence, whether written or oral, tending to show that the transaction was really one of security is admissible, not for the purpose of contradicting the terms of the instrument, but of raising an equity paramount to the mere form of the instrument.

APPEAL from the Circuit Court of Baltimore City.

The case is stated in the opinion of the Court.

The cause was argued before BARTOL, C. J., MILLER, ALVEY and IRVING, J.

*R. W. Baldwin,* *Geo. Hawkins Williams* and *S. Teackle Wallis,* for the appellants.

If the averments of the bill of the appellants can be maintained, there is no doubt of their right to relief. The proceeding is on the part of the principal stockholders of the Powhatan Company, suing not only for themselves but for all other stockholders who may come in. It is not only against certain parties who are still directors of that company and of the Bay Line Company, but against both of the said corporations. It charges fraud and conspiracy, as well as breach of trust, on the part of certain of the directors of the Powhatan Company, and imputes the same to the Bay Line Company itself, which really sat at the board of the Powhatan Company in the persons of its own directors, representing stock of the latter company, purchased by the Bay Line for the express purpose. It alleges the control exercised by the Bay Line directors over the Powhatan Company, as precluding all action on the part of the latter corporation to vindicate the rights of its shareholders and redress their wrongs. Under these allegations it is assumed that the right of the shareholders to seek relief in equity, in their own names and behalf, cannot be successfully disputed.

Nor is it necessary to the relief prayed that either a conspiracy or confederacy, *ab initio,* should be established, or that actual personal fraud should be made out. Directors of corporations are trustees for shareholders and creditors. *Jackson vs. Ludeling,* 21 *Wal.,* 624.

They have the duties and liabilities, and are subject to the obligations and responsibilities which attach to fiduciaries generally. For any wilful dereliction of duty, or gross negligence or inattention to duty, amounting to a breach of trust, they are as fully liable as for actual, intentional fraud. *Dodge vs. Wolsey,* 18 *Howard,* 341 ; *Peabody vs. Flint,* 6 *Allen,* 56 ; *Hodges vs. N. E. Screw Co.,* 1 *Rhode I.,* 341 ; *Salmon vs. Richardson,* 30 *Conn.,* 573 ; *Field*

*on Corporations, secs.* 141, 399, 400, *and notes, pages* 424, 425, 427; *Gray vs. Lewis,* 8 *Equity,* (*L. R.,*) 526; *Spering's Appeal,* 71 *Pa.,* 11; *Scott vs. Depeyster,* 1 *Edw. Chy.,* 513; and see *Green's Brice's Ultra Vires,* (*2nd Am. Ed.,*) 477, *and notes,* 484 *to* 486, *and notes; Robinson vs. Smith,* 3 *Paige,* 233; *Brewer vs. Bost. Theatre,* 104 *Mass.,* 387. *A fortiori* is this the case, where acts *ultra vires* are contemplated or have been committed. *Heath vs. Erie Railway Co.,* 8 *Blatchf.,* 406; *Pond vs. Vermont Valley R. R.,* 12 *Blatchf.,* 280.

And wherever equity would have prevented an act *ultra vires,* by injunction, it will grant relief after the act has been done. *Gregory vs. Patchett,* 33 *Beavan,* 607.

Being fiduciaries, directors in corporations can no more represent opposing or conflicting interests, or occupy double and inconsistent capacities, in relation to the subject-matter of the trust, than any other trustees. Whenever they do so; whenever they represent their own interests or those of others, in performing their duties or exercising their functions as directors, they subject their acts to the most rigid scrutiny, and assume the burden of establishing their legality by affirmative proof. Such acts at best are voidable. It is not a question of actual fraud merely, but of public policy, founded on the facility for fraud, and the temptation to it, which such divided interests and opportunities afford. *Md. Fire Ins. Co. vs. Dalrymple,* 25 *Md.,* 266; *Schwartz vs. Yearley,* 31 *Md.,* 270, 278; *Parish vs. Cumb. Coal & I. Co.,* 42 *Md.,* 605 *to* 607; *Abbott vs. Am. Hardware Co.,* 33 *Barb.,* 578, 593, 594.

Directors cannot vote, nor can stockholders, when personally interested. *Butts vs. Wood,* 37 *New York,* 319; *Atwood vs. Merryweather, L. R.,* 5 *Equity,* 464 *n.*

Where they are directors of and interested in two corporations, they cannot make or participate in the making of contracts between the two. *Polar Star Lodge vs. Same,* 16 *La. Ann.,* 70; *Abbott vs. American Hard Rubber Co.,*

33 *Barb.*, 578, 593, 594; *St. James Church vs. Church of Redeemer*, 45 *Barb.*, 356; *San Diego vs. S. D. R. R.*, 44 *Cal.*, 113; *Green's Brice's Ultra Vires*, 479a, (*2nd Am. Ed.*); *Field on Corporations, sec.* 175.

Whatever disability, in these regards, would attach to the directors of the Bay Line Company, who became directors in the Powhatan Company, would attach to the Bay Line itself, which in fact was the purchaser and owner of the Powhatan stock, and sat, in the persons (as has already been said) of its directors, at the board of the Powhatan Company. The Bay Line Company, thus practically and substantially a director of the Powhatan, Company, became *ipso facto* a fiduciary, in its corporate capacity, and its acts, in all matters in which it represented its own interests or which involved those interests, at the board of the Powhatan Company, were *prima facie* fraudulent in law, and impose the *onus* on the Bay Line Company, of establishing their *bona fides* and validity. When the Bay Line Company bought stock in the Powhatan Company, and its directors went into the latter company, to control it, with the full knowledge of an, existing rivalry, or a conflict of interests, already arisen or likely to arise, between the Powhatan Company and the Bay Line, or the other affiliated corporations with which the Bay Line, or its directors or corporators, were connected in business or interest—they deliberately and wilfully placed themselves in a false position. They were bound to know that they could not serve two masters, or do their duty equally to two antagonists. They purposely did what the law forbids. They undertook not only to act with *uberrima fides*, but to prove that they so acted. They subjected themselves to all the temptations and risks, which their false and forbidden position involved in fact, and all the adverse presumptions and personal responsibilities which the law attaches to it. Their very act, in assuming such a position, was in itself an illegal confederacy, in contemplation of equity.

Corporations cannot purchase stock in other corporations, unless expressly authorized by law to do so. *Mutual S. Bank vs. Meriden Co.,* 24 *Conn.,* 159; *Berry vs. Yates,* 24 *Barb.,* 210; *E. A. B. Co. vs. E. C. R. W. Co.,* 73 *E. C. L.,* 810; *Central R. W. Co. vs. Collins,* 40 *Georgia,* 628, 43 *Georgia,* 57; *Sumner vs. Marcy, Woodb. & Min.,* 111; *Dandridge vs. Penn. S. N. Co.,* 8 *Gill & J.,* 319; *Weckler vs. 1st Natl. Bank,* 42 *Md.,* 590, 591; *Green's Brice's Ultra Vires,* 91 *n. b.,* (*2nd Ed.*)

Nor can they consolidate or amalgamate themselves with other corporations, without express lawful authority. *Pearse vs. Mad. & Ind. B. R. Co.,* 21 *Howard,* 441; *Field on Corporations, secs.* 426, 427.

This latter disability cannot be got rid of or circumvented, by one corporation's buying up the stock of another, and practically administering or governing it. The evil which forbids an authorized consolidation, is the danger that a corporation, chartered for one purpose, may by that process exercise the whole chartered power of another and a different one. A railroad company, forbidden by its charter to exercise banking powers, might exercise them, nevertheless, to the utmost and most dangerous extent, by buying up the stock of a bank. Monopolies, of the most hurtful sort, might in the same way be set up and consolidated, to the destruction of large public interests, and yet often without the public knowledge or suspicion. The law will not tolerate so plain an evasion of a beneficial principle.

Neither a corporation nor a majority of the corporators can lawfully use their power to the injury of the minority. *Green's Brice's Ultra Vires,* (*2nd Ed.*) 683; *Brewer vs. Boston Theatre,* 104 *Mass.,* 395, 396; *Menier vs. Hooper's Teleg. Works,* 9 *Chy. App. L. R.,* 350.

The transaction which took the shape of a purchase of the Steamer Petersburg, from the Powhatan Company, was in law as well as substance and fact, a loan of money

upon the security of that steamer. *Dougherty vs. McColgan,* 6 *G. & J.,* 280, 281; *Baugher vs. Merriman,* 32 *Md.,* 192; *Pugh vs. Davis,* 6 *Otto,* 336; *Russell vs. Southard,* 12 *How.,* 148, 151, 152.

Whether a loan or a purchase, it was in every point of view, a scandalous transaction, and especially when it is borne in mind that the parties to it, being fiduciaries, acted in the double capacity of buyers and sellers, or lenders or borrowers, as the case may be. A Court of equity will strip it of all disguises, and treat it as an act of simple spoliation, to which no color of validity can be given by its solemnity or its form.

*Randolph Barton* and *1. Nevett Steele,* for the appellees.

The principles of law governing this case are simple. The duties and obligations of directors in corporations, to the stockholders they represent, have been likened to the duties of trustees to their *cestuis que trust.* This undoubtedly is the doctrine in this State as laid down in the case of *The Hoffman Steam Coal Company vs. The Cumberland Coal and Iron Company,* 16 *Md.,* 456. But no case is to be found imposing upon such officers a greater obligation than to direct and manage the interests confided to them, in a manner which honestly accords with their best judgment—unerring judgment is not expected of them. Infallibility is never looked for. Blunders of the grossest sort are readily tolerated, if they can be attributed to anything short of *fraud.* It is fraud alone that will render directors personally responsible.

The only issues in this case are:

1st. Were the defendants guilty of *fraud* in their connection with the Powhatan Company?

2nd. Was the transaction of the "Petersburg" a *sale* of that property, or was it a mortgage?

The following citations would seem to settle the law governing the first question:

"But although directors may be liable and required to indemnify parties injured on account of their fraud and abuse of trust, they cannot be held personally responsible where the injury is the result of mere misjudgment, or only unwise, extravagant, improvident, slightly negligent, or a simple error in the performance of their duties. The only effectual remedy in such cases is to change the Board and thereby the management of the corporate officers." *Field on Corporations*, 186.

"It should be observed however that though loss accrue to the funds of an incorporated company, through a mere error on the part of the directors, though it be in a matter of law, they are not personally liable, unless there has been negligence or fraud. The remedy in case of loss by misjudgment merely, is to be found, not in the Courts, but in the corporation itself; in its power by new elections to confide its interest to other managers. No man who takes upon himself an office of trust or confidence for another, or for the public, contracts for any thing more than a diligent attention to its concerns, and a faithful discharge of its duties. He is not supposed to have attained infallibility, and does not therefore stipulate that he is free from error. In order to subject him, the error must be so gross as to warrant the imputation of fraud, or at least, must indicate a want of the usual and necessary knowledge for the performance of the duty assumed by him in accepting the office or agency." *Angell and Ames on Corporations*, (10th *Ed.*,) sec. 314.

In *Spering's Appeal*, 71 *Pa. St. R.*, 24, SHARSWOOD, J., after reviewing the leading cases in England and America, concludes as follows: "It seems unnecessary to pursue this investigation any further. These citations, which might be multiplied, establish as it seems to me, that while directors are personally responsible to the stockholders for any losses resulting from fraud, embezzlement or wilful misconduct, or breach of trust, for their own benefit, and not

for the benefit of the stockholders, for gross inattention and negligence by which such fraud or misconduct has: been perpetrated by agents, officers or co-directors, yet they are not liable for mistakes of judgment, even though they may be so gross as to appear to us absurd and ridiculous, provided they are honest, and provided they are fairly within the scope of the powers and discretion confided to the managing body." See *Godbold vs. The Branch Bank of Mobile,* 11 *Ala.,* 199.

ALVEY, J., delivered the opinion of the Court.

The bill in this case was filed on the 7th of August, 1875, by certain persons as shareholders of the stock of the Powhatan Steamboat Company, a corporation formed under the act of the Legislature of 1840, ch. 167, against the defendants, some of whom were directors in the company, for the purpose of obtaining redress for what is. alleged to have been their loss in the value of their shares of stock, by reason of certain wilful and fraudulent mismanagement of the affairs of the corporation, to accomplish objects and purposes adverse to the interest of the shareholders of the stock of the company.

By the charter, the company was clothed with power to provide itself with all necessary steamboats, and other equipments, "to navigate the Chesapeake bay and its. tributary streams, for the conveyance of passengers, towing of ships, vessels, rafts or arks, and the transportation of merchandise or other articles." The affairs of the company were required to be managed by a president and board of directors to consist of six persons, to be chosen from the stockholders, the president to be one of the six directors ;. and a *majority* of the directors, at all meetings, to have power to act as if all were present. The power given by the charter to the board of directors, was very large and comprehensive. It authorized them not only to employ all necessary agents, to make contracts, to buy property both

real and personal, for the purposes of the company, to build or purchase all such boats as they should deem necessary, etc., but the same, or any part thereof, *to sell or otherwise dispose of*, when, in their judgment, it should be to the interest of the company that it should be done. The directors, or the stockholders holding a majority of the stock, were authorized to call a general meeting of stockholders; " and a majority of the stock represented at said meetings, shall have the power of closing and winding up the concerns of said company."

Before this company had been incorporated, the Baltimore Steam Packet Company had been incorporated by the Act of the Legislature of 1839, ch. 328; and the object of that company was to provide the necessary steamboats and equipment, " to navigate the Chesapeake bay and its tributary streams, or to navigate the Atlantic coast, or any of the bays or rivers emptying into the Atlantic Ocean; and to connect thereto boats, vessels, stages, or other carriages, for the conveyance of passengers, towing of ships, vessels, rafts, or arks, and the transportation of merchandise or other articles." The board of directors is required to consist of eight persons, to be chosen from the stockholders, and the president of the board to be one of the directors. The provisions of the charter, and the powers of the board of directors, are substantially, and almost literally, the same as those contained in the charter of the Powhatan Steamboat Company.

Both companies were organized and operated for several years prior to the late civil war; but the war suspended the operations of both companies. After the close of the war, the Steam Packet Company resumed operations, and the Powhatan Company reorganized, by the purchase of several second-hand steamers for stock of the company, at rates considerably in excess of the prices of the steamers to those disposing of them to the company. The routes of the two companies were not at all in conflict the one

with the other.  The route of the Steam Packet Company was between the City of Baltimore, Maryland, and the City of Norfolk, in the State of Virginia; and the main route or line of the Powhatan Company was from Baltimore to Richmond, by way of the Chesapeake bay and James river; with a light draught boat plying on the Appomattox river, between Petersburg and City Point, on the James river, as a branch line.  The Powhatan Company, after its reorganization, established a subsidiary route or line, from Baltimore to Richmond, by way of the York river, connecting at West Point, on said river, with the Richmond and York River Railroad, running to and from the latter named city, and thus forming a through line from Richmond to Baltimore.

These were the routes of the two steamboat companies, and there had been no serious conflict or competition between them prior to the fall of the year 1870; but there had been considerable competition between the Powhatan Company and the Richmond, Fredericksburg and Potomac Railroad Company, running from Richmond to Acquia creek, and from the latter point by steamers, by way of the lower Potomac and the Chesapeake bay, to Baltimore City.  The Powhatan Company had also encountered strong competition on its York river line, and was compelled to buy off the steamers engaged in the opposition.

In the latter part of November, in the year 1870, the Steam Packet Company became the purchasers of 1108 shares of the capital stock of the Powhatan Company, at $40 per share, the par value being $100 per share.  This quantity of stock was about one-third of all then issued by the company.  And, according to arrangement, this stock thus purchased was transferred to the names of Jno. M. Robinson and Samuel M. Shoemaker, two of the directors in the Steam Packet Company; and thereupon, two of the directors in the Powhatan Company, namely, Messrs. Lehr and O'Donnell, retired, and Robinson and

Shoemaker were elected in their stead.  Robinson was also, at the time, and continued to be, stockholder and president of the Seaboard and Roanoke Railroad Company, whose road runs from Norfolk, Va., to Weldon, in North Carolina, and of the Richmond, Fredericksburg and Potomac Railroad Company, and in the latter of which Shoemaker was also stockholder and director; and all of which companies are alleged to have been, more or less, competitors in trade with the Powhatan Company.

The bill charges, that Robinson and Shoemaker, having obtained admission into the Powhatan Company, acted not for the promotion of the interest and welfare of the stockholders of that company, as they were in duty bound to do, but that they acted "on their own behalf and for their own interest, as well as in behalf and for the interest of others owning and controlling together with themselves, a majority of the stock of said three confederating companies, *unlawfully and covinously combined together*, to cripple, embarrass, and destroy the said Powhatan Steamboat Company, so as to secure to the said Baltimore Steam Packet Company, and its said confederates, or such other companies as it might choose, a monopoly of the said routes of the said Powhatan Steamboat Company;" and that it was with that view and purpose that they purchased on behalf of the Steam Packet Company the 1108 shares of stock, and procured themselves to be elected directors in the Powhatan Company; and from that time they continued their plans and contrivances for the ruin of the Powhatan Company, and finally brought it to total wreck, in the winter of 1875, by declaring it insolvent and thenceforth unable to proceed with its business.  There are various acts and transactions charged as means resorted to to bring about the result.  It is charged that through the contrivance of Robinson and Shoemaker, the better to obtain complete control over the Powhatan Company, they being directors in both companies, the

Steam Packet Company was induced to loan to the former company a large sum of money, *without corporate authority for so doing,* and to take a bill of sale, absolute in form, of the Petersburg, one of the best steamers of the Powhatan Company, as security for such loan; and which steamer was ultimately taken and appropriated by the Steam Packet Company. It is also alleged that they, with an intent to cripple the company, and to frustrate its prospects, refused to enter into an arrangement with parties owning and representing the Richmond and York River Railroad Company, in the spring of 1873, for the running a daily line of steamers, in connection with the railroad, between Baltimore and Richmond, by way of the York river, and that by reason of such refusal to make such connection, other steamers were placed upon the line, and strong competition brought about, resulting in ruinous loss of business and profit to the Powhatan Company. It is further alleged, that by the wilful mismanagement of the property of the company, great wrong was done and loss sustained. As an instance of such mismanagement, the surrender of one wharf and the renting another at a larger rent, less available to the requirements of the company, at Richmond, is specified; also the refusal to repair the steamers of the company, and the allowing them to remain idle, while steamers of the Steam Packet Company were being chartered by the Powhatan Company for daily use; and finally the buying up a majority of all the stock of the Powhatan Company in order to get entire and complete control of the affairs of the company, for sinister and fraudulent purposes; are charged as so many distinct breaches of duty, all having for their object, and tending to the accomplishment of, the complete ruin of the company; and that, by such means, the ruin of the company was in fact finally accomplished.

The answers of the defendants, Moncure Robinson, John M. Robinson and Samuel M. Shoemaker, Thomas

Kelso, the Baltimore Steam Packet Company, and the Powhatan Company, strongly controvert many of the most material facts alleged in the bill, and utterly deny all charges of fraud, gross negligence, or intentional mismanagement of the affairs of the company by the board of directors, so far as the defendants were concerned ; and aver and insist that the misfortunes, and disastrous termination of the operations of the company, were owing exclusively to the inherent weakness of the company itself;—its poor and insufficient equipment, and its want of sufficient capital to enable it to carry on its operations successfully.

Jacob Brandt, a former director and president of the company, is also a defendant, and he filed a separate answer to the bill, in which he admits most of the material facts charged ; and he was afterwards examined as a witness for the plaintiffs.

There has been a very large mass of evidence produced, documentary as well as oral testimony of witnesses ; but before making special reference to this evidence, it is proper that we should state the general principles of law that would seem to be applicable, and which must govern in the determination of the case.

The first question is, as to the power of the Steam Packet Company to purchase and hold the stock of the Powhatan Company. This, it is contended by the plaintiffs, could not be done without express authority by law. But, while some Courts have so held, the great weight of authority is the other way. There is nothing in the charter of the Steam Packet Company, or in the nature of its business, that would, in the slightest manner, forbid the exercise of such power ; and having money to loan or invest, there would appear to be no good reason why it might not invest in the stock of other corporations as well as in any other funds, provided it be done *bona fide,* and with no sinister or unlawful purpose. The Courts of

England, at one time, strongly opposed the right of one corporation to deal or invest in the stock of another corporation without express authority for so doing; but that opposition has been entirely overcome, and it is now settled there, that one corporation may deal in the shares of another, without express authority so to do, unless where expressly prohibited, or the nature of its business render it improper so to deal. *Re Barned's Bank, L. R.,* 3 *Ch.,* 105; *Re Asiatic Banking Co., L. R.* 4 *Ch.,* 252. In the latter of the cases just cited, Lord Justice SELWYN, in speaking of this power of corporations, said,—"As to the capacity of a trading corporation to accept shares in another trading corporation, it is sufficient for me to say that I entirely agree with the judgment of Lord CAIRNS, in the case of *Barned's Banking Company,* viz., that there is not, either by the common or statute law., anything to prohibit one trading corporation from taking or accepting shares in another trading corporation. There may, of course, be circumstances which prohibit or render it improper for a company so to do, having regard to its own constitution, as defined by its memorandum and articles." It is in accordance with this statement, that the law is laid down as settled, by Brice, in his work on *Ultra Vires,* *pp.* 91, 92. And in this State, the same principle has been fully sanctioned in the case of *Elysville Manf. Co. vs. Okisko Co.,* 1 *Md. Ch. Dec.,* 392, and same case affirmed on appeal, in 5 *Md.,* 152. Here, the stock that was purchased on account of the Steam Packet Company was transferred to the names of Robinson and Shoemaker, who held it as trustees for the benefit of the Steam Packet Company; and being thus qualified, they were legally eligible as directors in the Powhatan Company. The fact of their being directors of the Steam Packet Company in no way disqualified them from also being directors of the Powhatan Company. But if there have been as alleged, illegality or impropriety in their acts and proceedings in

the management of the affairs of the latter named company, such acts and proceedings are subject to different considerations.

It is also alleged and insisted that the $40,000 advanced or loaned by the Steam Packet Company to the Powhatan Company, upon what is alleged to be the security of the steamer Petersburg, was unauthorized by any power contained in its charter; and, upon the principle now perfectly well settled, that a body incorporated for special purposes cannot devote any part of its funds to objects unauthorized by the terms of its charter, it is contended that such contract for loan or advancement was therefore void. But whether we regard this transaction as being strictly within the powers of the Steam Packet Company, or otherwise, the legal result, so far as the stockholders of the Powhatan Company are concerned, must be the same. If the transaction be treated as a sale and purchase of the steamer, as contended by the defendants, there can be no question as to the existence of ample power; for the charters of both the Steam Packet Company and the Powhatan Company confer express authority to purchase and sell steamers. If, however, the transaction be treated as a loan, secured by mortgage, even conceding that there could be a question of the power of the Steam Packet Company to make such a loan of its funds, the contract being an *executed* one, that question of power could not be raised on a proceeding like the present. Moreover, in such case, where the parties complaining have received the consideration of the contract, in other respects just and equitable, there is no principle upon which a Court of equity could be induced to interfere upon the mere ground of the want of authority in the adverse party. *Elysville Manf. Co. vs. Okisko Co.*, 5 *Md.*, 152; *National Bank vs. Matthews*, 98 *U. S.*, 621, 628; *Silver Lake Bank vs. North*, 4 *John. Ch.*, 370. And the same considerations apply to all the mortgages made by the Powhatan Company to the Steam Packet Company.

With respect to the power of the Powhatan Company to borrow money and secure the same by mortgage of its property, we can entertain no doubt. It is true there is no such express power found in its charter; but power is conferred upon its board of directors to make all necessary contracts, and to sell *or otherwise* dispose of any portion of its property, whenever in the judgment of the directors it should be found to be to the interest of the company. This would seem to be comprehensive enough. But, independently of this, it is now well settled, that corporations, like individuals, may borrow money for the conduct of their affairs, without express authority therefor, whenever the nature of their business may render it proper or expedient. And the power to borrow carries with it very generally, unless expressly restrained, the power to secure the loan by mortgage. *Susquehanna Bridge Co. vs. Ins. Co.*, 3 *Md.*, 305; *Australian Steamship Co. vs. Mounsey*, 4 *K. & J.*, 733; *Green's Brice's Ultra Vires, pp.* 213 *to* 225, and the cases there cited. Whether the power was properly exercised in this case, or whether it was exercised as a means to accomplish a forbidden and unlawful purpose, as alleged by the plaintiffs, is a question altogether aside from the question of the existence of the power.

Seeing, then, that the case presents no question of *ultra vires* in the transactions referred to, the next question is, upon what principle or doctrine are the defendants in this case to be held responsible to the plaintiffs for losses alleged to have been sustained by them, in the management of the affairs of the corporation?

Directors in joint stock corporations are not, in the strict and technical sense of the term, trustees for the stockholders. The property of the corporation is not vested in them, but in the body corporate. They are, however, in one sense, trustees, and they occupy a fiduciary relation to the corporation and its stockholders.

They are entrusted with powers which are to be exercised for the common and general interest of the corporation, and not for their own private individual benefit. The confidence reposed in them, and the position they occupy towards the corporation and its stockholders, require a strict and faithful discharge of duty, and they are not allowed to derive from their position, either directly or indirectly, any profit or advantage whatever, except it be with the full knowledge and concurrence of the company, represented by others than themselves. And if this relation and duty be violated, to the injury of the corporation or its stockholders, the law affords an ample redress for the wrong against the guilty parties.

In the English Courts, the case of the *Charitable Corporation vs. Sutton*, 2 *Atk.*, 400, decided in 1742, is the first that occurs in which the liability of the directors to the corporation for breaches of duty amounting to breaches of trust, is fully and accurately defined. In that case, Lord HARDWICKE, in defining the degree of care and fidelity required of a director, and for what nature of default he may be liable, referred to the doctrine of the civil law upon the subject. By that law it is declared that "those who are named by companies and corporations to have the direction of their affairs, are obliged to the same care and diligence as factors or agents. And they are answerable, not only for any fraud and gross negligence which they may be guilty of, but also for all faults that are contrary to the care required of them." 1 *Domat,* 2 *b. tit.* 3, *sec.* 2, *Art.* 1. And in that case of *Sutton*, the Lord Chancellor held, that directors of a corporation are liable in equity to the corporation, not only for gross frauds and breaches of trust, whereby the assets of the corporation are wasted, but are also liable to the corporation, if the assets of the corporation have been wasted by negligence on their part so gross as to amount to a breach of trust. This is the leading case upon the subject, and in which the law is as

strongly laid down as in any subsequent case. The case of *Spering's Appeal,* 71 *Penn. St.,* 11, where the decisions are carefully examined, does not carry the doctrine further than the case of the *Charitable Corporation vs. Sutton,* nor does any other case to which we have been referred. They all concur in holding that, in equity, the directors are personally liable for the consequences of their frauds or malfeasance, or for such gross negligence as may amount to a breach of trust, to the damage of the corporation or its stockholders.

In the case of *Overend, Gurney & Co. vs. Gurney, L. R.,* 4 *Ch.,*701, and the same case on appeal, reported as *Overend, Gurney & Co. vs. Gibb, L. R.,* 5 *H. L.,* 480, where the question was most elaborately discussed in respect to the negligence of directors, it was held, that facts which may show *imprudence* in the exercise of powers clearly conferred upon directors will not subject them to personal responsibility ; but if the imprudence be so great and manifest as to amount to *crassa negligentia,* and consequently a breach of trust, personal responsibility will be incurred. Indeed, all the cases agree that directors are not liable for the consequences of unwise or indiscreet management, if their conduct is entirely due to mere default or mistakes of judgment. And the *onus* of proof of fraud, combination, or gross negligence, to render the directors personally liable, is upon the party making the charge; and the proof must be clear and manifest. *Turquand vs. Marshall, L. R.,* 4 *Ch.,* 376; *Overend, Gurney & Co. vs. Gibb, L. R.,* 5 *H. L.,* 480; *Hodges vs. New England Screw Co.,* 1 *R. I.,* 312.

In these cases, the proper and primary party to complain and call the directors to an account, in a Court of equity, for fraud or breaches of trust, in the management of the affairs of the corporation, is the corporation itself; because the duty is owing, and the wrong is done directly to the corporation, and only indirectly to the shareholders.

And therefore to enable a shareholder, either for himself alone, or for himself and others, to maintain a bill against directors for such fraud or breaches of trust, he must allege and show, not only the violations of duty or breaches of trust on the part of the directors, but that he as stockholder has been damnified thereby, and that the corporation has failed or refused to take the proper legal steps for the redress of the wrong. *Dodge vs. Woolsey,* 18 *How.,* 331; *Memphis vs. Dean,* 8 *Wall.,* 73; *Robinson vs. Smith,* 3 *Paige,* 222; *Greaves vs. Gouge,* 69 *N. Y.,* 154; *Peabody vs. Flint,* 6 *Allen,* 52; *Brewer vs. Boston Theatre,* 104 *Mass.,* 378; *Foss vs. Harbottle,* 2 *Hare,* 461; *Thompson on Liability of Directors,* 385. But, in this case, if the allegations of the bill are sustained by proof, that a majority of the shares are owned by the Steam Packet Company, and that a majority of the directors are adverse to the interest of the plaintiffs, and are combined against them, and would, by means of the control that they exercise, frustrate and defeat any attempt to induce the corporation to take action for the redress of the wrongs alleged; such facts would be a sufficient excuse for not making or alleging a formal demand upon the corporation to take action. *Menier vs. Hooper Tel. Works, L. R.,* 9 *Ch.,* 350; *Mason vs. Harris,* 11 *Ch. Div.,* 97; *Heath vs. Erie R. Co.,* 8 *Blatchf.,* 347; *Thompson, Liab. Directors,* 385, 392. The Powhatan Company is made defendant as well as the Steam Packet Company, and that, in a case like the present, would seem to be essential. *Robinson vs. Smith,* 3 *Paige,* 222.

In this case, the fact that Robinson and Shoemaker were stockholders and directors in the Steam Packet Company, as well as in the Powhatan Company, and participated in the transactions between the two companies, with certain interest in other companies, supposed to be interested, would seem to constitute the main foundation for the principal charges of the bill. And if

it be true, as charged by the plaintiffs, that the two-defendants, Robinson and Shoemaker, acting for and in behalf of the Steam Packet Company, did purchase the stock in the Powhatan Company, and procure themselves to be elected directors therein, for the purpose of getting control of the management of that corporation, and by that means to make it subservient to the interest of rival companies, or with the design of making insolvent and utterly breaking down the corporation altogether, and thus getting rid of competition, no more flagrant fraud could be perpetrated; and there can be no question but that for all loss to the company or its stockholders, resulting from the carrying out of such device or contrivance, the guilty parties should be held responsible to the fullest extent allowed by the law. Not only would there be incurred a personal responsibility by the directors or agents participating in the wrong, but, if such a scheme were devised and executed at the instance and on behalf of another corporation, deriving its powers and franchises from the State, such conduct would be a fraud upon the State; and in addition to incurring civil liability for the injury done, such conduct would subject the offending corporation to the penalties of misuser or abuser of its franchises. A corporation cannot be allowed to do indirectly and covertly, what it is not authorized to do directly and openly. And whenever such an attempt is made, the Courts can neither be too emphatic in condemning the act, nor too ready to afford the strongest remedy allowed by the law for the prevention or redress of the wrong.

Such is the law as applicable to the case as stated in the bill. But if, upon the proof, there is a failure to establish the fraudulent design or purpose alleged to have characterized the various acts and transactions done and instigated by the two directors named, the whole foundation of the case fails. For, as we have seen, mere indiscretion, want of skill or foresight, or mistakes of judg-

ment, in the conduct of the affairs of the corporation, afford no ground of personal liability on the part of the directors.

And upon the question of the fraudulent intent or design charged, though it be true that these two directors represented both corporations,—in the one, being two of a board of eight directors, and in the other, two of a board of six directors,—this fact alone, while it should subject their conduct to rigid scrutiny by the Court, does not afford ground of presumption against the legality and fairness of the dealings and transactions between the two companies. The two companies were certainly competent to contract the one with the other ; and the two directors whose conduct is in question were interested in both companies, and by their relation to and official positions in them, they owed duties, and were bound to be faithful alike, to both. Therefore, while acting within the scope of the powers delegated to them by the stockholders of the corporation, there is no presumption of illegality or unfairness in their dealings and transactions as between the two companies. They were the chosen agents of both ; and to be successful in any attempt to impeach the validity of their acts, with a view of making them personally responsible either to the corporation or to the stockholders, there must be distinct charges of misconduct, fully supported by proof. *Adams Mining Co. vs. Senter,* 26 *Mich.,* 73 ; *U. S. Rolling Stock Co. vs. Atlantic & Great Western R. Co.,* 34 *Oh. St.,* 450.

This case is altogether unlike that of a trustee, agent, or director, bargaining in a matter of personal advantage to himself individually, with the party reposing the confidence in him, and where it is incumbent upon him to show that a fair and reasonable use has been made of that confidence ; as in the cases of the *Hoffman Steam Coal Co. vs. Cumbld. Coal & Iron Co.,* 16 *Md.,* 456 ; *Cumbld. Coal & Iron Co. vs. Parish,* 42 *Md.,* 598 ; *Jackson vs. Ludeling,*

21 *Wall.*, 616, and other cases of that class to which reference might be made. In that class of cases the law proceeds upon the principle of constructive fraud, irrespective of fraud in fact, and hence the *onus* of proof is upon the party seeking to maintain the transaction. But in a case like the present, where the effort is to make the defendants personally liable for alleged injuries occasioned by conduct wilfully fraudulent, in intent and purpose, amounting to breaches of trust, the proof in support of the allegations must be other than mere constructive fraud or breaches of trust;—there must be affirmative proof of the misconduct charged, going to establish the fraud in fact.

Such being the requirement of the case, the motive and intent with which the various acts were done, or left undone, by the directors, and charged as fraudulent, become most material.

It has been argued, that Robinson and Shoemaker, being stockholders and directors in the Steam Packet Company, and bearing the same relation to other companies mentioned, designed and intended from the commencement of the connection between the Steam Packet Company and the Powhatan Company, to wreck and bring to utter ruin the latter company: That their object in getting the stock in the latter company was either to cripple and bring it to ruin, or to make it entirely subservient to the interest of the other companies in which they were interested. But, upon careful examination of the evidence, we do not think that the facts proved warrant that conclusion.

The proof clearly shows that the Powhatan Company as re-organized was never strong either in equipment or finances. The steamers owned by it were bought up after the war in rather a worn condition, and required considerable repair. They were placed in the company after being repaired, for stock, at an exaggerated valuation. The com-

pany seems to have been without surplus or even the necessary working capital; and after operating for five years without profit, with a sharp competition, one of the steamers at least had become dilapidated and required repair, and the company was without the necessary means to pay the cost. That the management was bad admits of no doubt. The books of the company were not regularly kept, and did not show its real condition. There were no funds on hand, and there was not even a bank account kept. Dividends had been declared when there were no profits out of which to pay them. All agree that the company was largely in debt, and was financially embarrassed; and that this was its condition when Robinson and Shoemaker became connected with it about the close of the year 1870.

In this state of things, one would naturally suppose, if the ruin and utter destruction of the business prospects of the company were the results desired to be accomplished, instead of investing a large sum of money in its stock, furnishing aid by the loan of money, and by a change in its management, bringing about partial success in its operations, so as to enable it, to a considerable extent, to pay off its prior indebtedness, Robinson and Shoemaker would have counselled the Steam Packet Company to stand aloof, refuse all aid, and to offer no obstacle to the ruin that seemed to be approaching the Powhatan Company. But such was not the course pursued.

Whether Robinson and Shoemaker sought to become interested in the company on behalf of the Steam Packet Company, or whether they were invited and urged to that course by those representing the Powhatan Company, is a question upon which there is a conflict of testimony. But the undisputed facts of the case would rather indicate that their introduction into the company was desired on the part of the dirctors and those interested in the welfare of the company; for otherwise it is difficult to con-

ceive how they obtained admission. It was well understood, as a *sine qua non* to the Steam Packet Company's becoming interested, that it was to get at least one-third of the stock of the Powhatan Company, so as to be entitled to two directors; and the price of the stock; who should sell out, or sell such proportion of his shares as should be necessary; and which of the then board of directors should retire to make place for the two new directors; were questions that were fully discussed, and assented to by all concerned. The price of the stock first demanded was $90 per share; but the parties subsequently fell to $40 per share, and at that price sold to the Steam Packet Company 1108 shares, being the one-third of the whole amount of stock that had been issued by the company. These circumstances not only show the desire on the part of those representing the Powhatan Company for the admission of those representing the interest of the Steam Packet Company, but they strongly indicate to what straitened condition the former company was reduced, and the estimate of its worth and credit. The Steam Packet Company having purchased the 1108 shares of stock at a cost of $44,320, it was but rational and prudent that it should have insisted upon having two directors in the board of direction, especially in view of the previous management of the affairs of the company. From this time to the summer of 1873, the company seems to have had considerable prosperity, making profit, and reducing to a considerable extent its former indebtedness.

It is also argued, that the fact that the Steam Packet Company advanced money, and took bills of sale or mortgages of the steamers of the Powhatan Company, is proof of the design or intention to get entire control of the property of the latter company, and thus to destroy its ability to carry on its operations. But we think no such conclusion can fairly be drawn from that fact, either stand-

ing alone or taken in connection with the other facts of the case. It was one of the first things that occurred, after the election of Robinson and Shoemaker as directors, that they were requested to become instrumental in procuring a loan of $40,000 from the Steam Packet Company. This transaction does not appear to have been at all at their instigation, but was suggested and urged by the other directors. The $40,000 were obtained, and the only security the Powhatan Company had to give, or could give, was a bill of sale or mortgage of one of its steamers. In this we discover nothing that can be fairly construed into a purpose to work harm or destruction to the borrowing company. And so with the other loans made. They were all sought and obtained to relieve pressing demands that the Powhatan Company could not otherwise meet. And the fact that the money was attempted to be secured by mortgages on the steamers of the latter company, affords no ground for the argument attempted to be supported from this part of the case.

Down to the spring or summer of 1873, there was entire harmony among the directors, and a full concurrence in all the proceedings of the company. There was no complaint, or objection made from any quarter. Robinson and Shoemaker had been elected and re-elected without opposition; and it does not appear that it had ever been suggested that they had acted, or attempted to act, since being directors, in a manner hostile to the interest of the company, or that they were in any way sacrificing the interest of the company to rival companies in which they were interested. Indeed, being but two in a board of six, they were powerless for any such purpose, even if they had been disposed to such course. It was not until May, 1873, after Clyde had obtained control of the Richmond and York River Railroad, and had come forward with his project of a daily line instead of a tri-weekly line, between Baltimore and Richmond,

by way of the York river, to be run by the Powhatan Company in connection with his road, that the trouble commenced. But whether it would have been more judicious to accept than to reject the proposition of Clyde, is not the question that we have to decide. It may be conceded, for the sake of the argument, that it would have been better for the Powhatan Company if the proposition of Clyde had been adopted. It seems to be quite certain that the disastrous fate of the company was greatly accelerated by the opposition line run by Clyde and his associates on the York river route, in consequence of the failure of the Powhatan Company to accede to the proposition to run the daily line. But the question is, was it by means of the acts and conduct of the defendants that the proposition to run the daily line was rejected, and if so, were they actuated in the matter by motives and with the design of doing wrong, and bringing loss and disaster to the Powhatan Company?

In their answers and in their testimony, the two Robinsons and Shoemaker are explicit and emphatic in denying, 1st, that it was within the power of the company, owing to its want of pecuniary means, to accede to and adopt the proposition, with the conditions involved, to run a daily line to make the connection on York river; 2nd, that it would have been wise or judicious to adopt the proposition, judging from the results of former experience, even if the company had been in a condition to comply with all the terms embraced in the proposition; and 3rd, that they were actuated, in the slightest degree, by motives or purpose to do wrong to the Powhatan Company, or that they acted with a view to the interest of other companies. And upon the whole evidence of the case, we discover nothing to justify us in withholding credence of their testimony.

The proposition for maintaining the daily line by way of York river, involved three conditions; 1st, that there

should be a daily instead of a tri-weekly connection with the railroad on York river; 2nd, that the Powhatan Company should put in complete repair its steamer Virginia, to be run on that line; and 3rd, that the Powhatan Company should purchase from the owners of the railroad their steamer Sue, to be run upon the same line with the Virginia.

The steamer Virginia could not, according to the lowest estimate, have been repaired for less than $25,000, and, according to the testimony of several witnesses, full and complete repairs would have cost from $60,000 to $70,000. The price of the Sue was $75,000, to be paid in the stock of the Powhatan Company at a valuation. This proposition, therefore, involved serious consequences to the company, especially in view of the fact of its limited resources, and of the conceded fact, that all prior efforts to maintain daily connection on that line had utterly failed. And in addition to this, there is an absence of apparent motive on the part of Robinson and Shoemaker to act in the matter with any wilful design of doing wrong to the Powhatan Company. That company had never been a serious competitor of the Steam Packet Company, their routes being different. The only company that was affected by the competition of the York river line was the Richmond, Fredericksburg, and Potomac Railroad Company; and that company, by the withdrawal of the steamers of the Powhatan Company, was left to compete with the more formidable rival of the Richmond and Chesapeake Steamboat Company, running its steamers in connection with the Richmond and York River Railroad, and in neither of which latter companies had the defendants, Robinson and Shoemaker, any interest whatever.

The charges in regard to the change made in the location of the wharf at Richmond, and the failure to repair the steamers of the company, are so fully explained in the

testimony that they need no extended examination. The change made in regard to the wharf was upon the urgent recommendation of the superintendent of the company at Richmond, and for what would appear to be very good and sufficient reason. The failure to repair the steamers would seem to have been for the best of all reasons, that is to say, it was doubtful whether they were really worth repairing, and to repair them to make them staunch and sufficient for service, required more money than the company had to expend, or could raise upon its credit.

In these transactions, therefore, we fail to find that the charges of the bill are supported, or that they afford any sufficient evidence upon the principles of law applicable to the case, for holding the defendants personally liable for fraud or breaches of trust in the management of the affairs of the corporation. We must not fail to observe, however, that there are circumstances in the case that were calculated to excite suspicion, and which tend to give color to some of the charges made in the bill. The strongest of these are the facts in connection with the buying up a controlling amount of the stock of the company in the summer of 1873, and the election of Mr. Kelso as director, he being at that time one of the directors in the Steam Packet Company. This was done, however, in the midst of the contention between Booth and Clyde on the one side, and Robinson and Shoemaker on the other, in regard to the proposed daily connection on the York river route; and with the views of the latter named contestants, as to the inability of the company to conform to the conditions proposed, and the certain failure or disaster that would ensue, if the proposition were adopted, they deemed themselves justified in what was done. Without at all approving their expedients to accomplish their purpose, we discover nothing in this conduct that would justify us in concluding that they were actuated by any fraudulent design to bring disaster upon the affairs of the Powhatan

Company, however unwise their conduct may have been. Upon the theory that they intended the ruin of the Powhatan Company, we must, at the same time, conclude that they deliberately intended to sacrifice the sixty-four or sixty-five thousand dollars that had been invested by the Steam Packet Company in the stock of the Powhatan Company;—a consequence that would go far of itself to rebut any presumption that might be indulged as to fraudulent motive or design on the part of those two directors as against the Powhatan Company.

That the company was utterly insolvent, and unable to proceed with its operations, with any prospect of success, at the time the stockholders in general meeting determined to close its affairs, is not disputed; and hence that resolution of itself forms no independent ground of complaint.

It follows therefore that the plaintiffs have failed to support the allegations of their bill in respect of the main ground of relief.

There is one other question remaining to be decided, and that is, whether the transaction between the two companies in regard to the steamer Petersburg was an absolute sale, or a mortgage only as a security for the loan of $40,000?

The proposition from the Powhatan Company was for a loan of $40,000. This was rejected, in that form, by the Steam Packet Company, but it agreed to advance the amount of money requested, upon receiving an absolute bill of sale for the steamer Petersburg, that the Powhatan Company had offered to mortgage. This proposition appears to have been acceded to, the money was advanced, and the absolute bill of sale executed. But there are several circumstances to show, that while the transaction was made to assume the form of an absolute sale, it was in substance, and, according to the understanding and intent of the parties, a mere loan of money,

and that the instrument taken was but as security, and therefore a mortgage. In the charter of the steamer by the Steam Packet Company to the Powhatan Company, after the bill of sale, the rate of hire was fixed at $1025 per month, the Powhatan Company to pay all the running expenses of the steamer, except the wages of the captain. The steamer was retained in the use and possession of the Powhatan Company for a considerable time under the charter, that company making all necessary repairs of the steamer ; and the monthly payments were regularly made to and credited by the Steam Packet Company. It would seem to be clear, from the evidence in the case, that it was perfectly understood that if the Powhatan Company succeeded in paying back to the .Steam Packet Company the $40,000, with interest, either by the the monthly payments. under the charter, or otherwise, the steamer was to be released to the Powhatan Company ; and the account kept of the transaction by the Steam Packet Company appears to have been as for a loan of so much money. These circumstances, taken in connection with the peculiar relation subsisting between the two companies, admit fairly of but one construction, and that is, that the bill of sale, though absolute is form, was really intended as a security for the money loaned. And in such case, no matter how absolute the conveyance may be on its face, the transaction will be regarded as a mortgage, and will be treated as such. *Artz vs. Grove,* 21 *Md.,* 456, 474. It is now the established doctrine that Courts of equity will look beyond the mere form and terms of the instrument to the real transaction ; and whenever the real transaction is shown to be one of security and not of sale, the Court will treat the matter accordingly. In all such cases, the equity upon which the Court acts, arises from the real character of the transaction, and therefore, any evidence, whether written or oral, tending to show that the transaction was really one of security, is held to

Booth, *et al. vs.* Robinson, *et al.*

be admissible. This is allowed, not for the purpose of contradicting the terms of the deed or instrument, but of raising an equity paramount to the mere form of the instrument. Such proof is allowed upon the same principle that extrinsic proof is admitted to establish a resulting trust as against an absolute deed, or to show that the deed was made to give an undue preference, or that the consideration upon which it was made was in its nature illegal. The jurisdiction of the Court attaches to prevent fraud or oppression, and to promote substantial justice as between the parties. The cases maintaining this doctrine are numerous, and they may be found collected, and the result of them clearly stated, in the American note to the leading cases of *Thornbrough vs. Baker*, and *Howard vs. Harris*, 3 *L. Cas. Eq.*, (3rd *Ed.*) *pp.* 625, 626; *Russell vs. Southard*, 12 *How.*, 139 ; *Peugh vs. Davis*, 6 *Otto*, 332, 336.

Being of opinion, therefore, that the bill of sale of the steamer Petersburg must be treated as a mortgage, and not as an absolute conveyance of the steamer, we shall reverse the decree of the Court below and remand the cause, that a proper account may be taken as between the two companies in respect to that transaction. And as to the costs of this suit, we are of opinion, under the circumstances of the case, that they should be paid, the one-half thereof by the appellants, and the other half by the Baltimore Steam Packet Company.

*Decree reversed, and*
*cause remanded.*

(Decided 2nd February, 1881.)