# THE PENNSYLVANIA RAILROAD COMPANY AND OTHERS

*vs.*

# J. LIVINGSTON MINIS AND OTHERS.

*Directors and stockholders: sales of property of corporations;
ratification; presumptions; price of sale; jurisdiction
of equity. Pleading and Practice in Equity:
burden of proof on
plaintiff.*

No equitable principle requires a Court of Equity to set aside
the sale of shares of stock made by directors of one corpora-
tion and ratified by its stockholders, to another corporation,
upon the mere ground that the stock was actually worth more
than the price received.                                    p. 499

Directors must be honest in their dealings with the property
under their control, but they are not required to be dishonest
or unjust towards others with whom they deal for the benefit
of their own stockholders.                              pp. 499-500

Where all the capital stock of a connecting road is purchased
through the instrumentality of a system of railroads and

placed in the name of one of the subsidiary companies, the stock has no market value in the ordinary sense, for the reason that it can not be honestly sold to any other than one of the subsidiary lines of the system, and whatever value it has depends entirely upon the amount of traffic of the subsidiary lines over the road. pp. 501-502

Where directors have authority to sell some property of a corporation and it is simply a question of price to be fixed, the directors are not required to ignore all business principles which should, and do control honest individuals in their dealing with others, or all equities which enter into the transaction. If the directors sell the property of a corporation for less than its real value, courts should subject their action to a close scrutiny; unless fraud be shown or the courts can see that the directors in some way have abused the confidence and trust placed in them, they have no right to interfere. pp. 502-503

Where stockholders of a corporation, at an annual meeting, ratify the action of the officers and board of directors by accepting the annual report, such action is binding on the minority, present as well as absent, unless there be fraud. p. 504

A plaintiff must recover in equity on the allegations of his bill and the evidence, and not on the defects or averments of the answers, except in the case of admissions. p. 504

The silence of a defendant in relation to any material allegations of the bill is not an admission of their truth, and the plaintiff must prove the same by direct evidence. p. 504

If an answer neither admits nor denies the allegations of a bill or does not state the facts positively, or states them inferentially, the effect is to put the plaintiff to the necessity of proving the facts alleged in the bill. p. 504

*Decided June 26th, 1913.*

*Wm. L. Marbury* and *Arthur W. Machen, Jr.,* filed a brief in support of a motion for reargument, in behalf of the appellees.

Boyd, C. J., delivered the opinion of the Court, overruling a motion for reargument.

A motion for a reargument in this case was filed, and a number of grounds supposed to be in support of it are stated in the brief. In the first place it is said that "A careful examination of the opinion of the Court has made it so entirely apparent to counsel of the appellees that, owing to the magnitude of the record and the shortness of time allowed for oral argument, this Court has fallen into such error as it will be not unwilling to have an opportunity to correct, that we feel it a duty owing to this Court as well as to our clients to urge this motion." If for the reasons assigned, or any other reason, the Court thought it had fallen into error in reaching the conclusion it did, it would not only be its duty, but its pleasure, to correct it, but if a reargument is to be granted because it is apparent to counsel for the losing parties that error has been committed by the Court, perhaps nine out of · ten cases (certainly many of them) would have to be reargued. A day was allowed for the oral arguments, and no limit was fixed as to the length of the briefs. The original one of the appellees contained 254 pages, exclusive of an index of fifteen pages, and two tabulated statements, and one of fifteen pages was filed in reply to those of the appellants, which contained over eighty pages. The Court had every opportunity, therefore, to understand the various points made by the respective counsel and the facts and authorities upon which they relied. It is true that the record was a large one, but such parts of it as reflected upon the questions involved were carefully read and considered.

But the important question is whether the Court has fallen into error which in any way affected the result as announced. We did not attempt in the opinion to discuss at length every question suggested, because we did not deem it necessary, and the opinion was unusually lengthy, as it was, and we will not refer to every suggestion made in the brief now before us. Anxious to correct any error that might be pointed out, which could possibly affect the result, we have carefully con-

sidered the brief, but have failed to find anything material which had not already been urged by counsel for the appellees, and duly considered by us. If our conclusion was likely to have such dire results as suggested in the brief, affecting "not merely the interests of the plaintiffs, but the interests of all shareholders of subsidiary corporations, and the status of the administration of justice in this State," it would, indeed, be unfortunate, and the mere suggestion makes us desirous of avoiding such results. It is true that the then recognized leader of the bar of Maryland (whose unfortunate death deprived us of the benefit of his argument) took part in making the defense relied on by the appellants, as is shown by the answer of the Northern Central Railway Company, signed by his firm, and by the examination of witnesses by him, and that other able and distinguished counsel argued the case in this Court, in support of the lines of defense taken in the answers, but nevertheless if it is likely to be so disastrous, the responsibility would be upon this Court.

The fundamental error in the appellees' position is that they assume that, as the stock of the Union Company was in 1882 taken in the name of the Northern Central Company, and was paid for by that company, if it was in 1894 worth considerably more than $110.00 per share, at which price the 5,000 shares were sold to the P., W. & B., then the appellees, as minority stockholders, have the right to ask a Court of Equity to set the sale aside, notwithstanding the circumstances shown. Regardless of the fact that the sale by the directors was ratified by the stockholders in the way pointed out in the opinion, more than fifteen years prior to the filing of the bill (which we will refer to later), we can not admit that there is any equitable principle which would require a Court of Equity to set the sale aside on the mere ground that the stock was actually worth more, if that be conceded. It is true that directors must be honest in their dealings with the property under their control, and of course they can not give away the property of the company, as the appellees say they in effect did, but they are not required to be either dis-

honest or unjust for the benefit of the stockholders when they deal with others. If the directors of the Northern Central had sold this stock, or any of it, to any company or individuals not connected with the Pennsylvania System, it would have been a gross fraud on that system. Whatever else may be said in reference to the absolute ownership of the stock by the Northern Central, it can not be successfully denied in the face of this record that it was purchased through the instrumentality of the P. R. R. Co., and was intended for the benefit of the companies composing its system at and about the city of Baltimore.

That company had only recently acquired the controlling interest in the P., W. & B. Co., already owning most of the stock of the Baltimore and Potomac Company, and was preparing to develop the business which has since been developed, for which the Union road was certainly as desirable as it was for the Northern Central, unless the P., W. & B. and the B. & P. obtained another line. The annual report of the P. R. R. Co. of 1882, in speaking of the purchase, said: "The acquisition of this line has largely tended to strengthen and improve the position of that company (Northern Central) in Baltimore, and gives your company the indirect control of the connecting link in that city between the Philadelphia, Wilmington & Baltimore, the Northern Central and the Baltimore and Potomac Railroads." It would have been folly for that company to put this link in the name of the Northern Central, in which it did not own a majority of the stock, instead of in the name of one of the other two, or in its own name, had it not been understood that the purchase was for the benefit of all. It in point of fact furnished the most, if not all, of the money with which the Union stock was purchased, as it paid $642,612.00 of the $700,912.00 of the proceeds of stock sold by the Northern Central, which it issued in order to pay for that of the Union Company and other purposes.

If those who negotiated and arranged the purchase in 1882 intended to place the stock beyond the reach and control of

the other companies of the Pennsylvania Railroad System, they were certainly not doing them justice, and their connection with that company of itself ought to be sufficient to show that there was no such intention or expectation. Mr. Newcomer not only carried on the negotiations in Baltimore for the purchase in 1882, but he was active and influential in the sale of the 5,000 shares to the P., W. & B. No one knew more of the entire transaction than he did, and he was in a position to intelligently inform the directors (of which he was one) of the circumstances under which it was purchased and in whose interest. The directors knew that the P., W. & B. was furnishing over 41 per cent. of the earnings of the Union Company; that with the exception of a small per cent. it was furnishing all of the income that the Union Company had, excepting what the Northern Central was paying, which as holder of all the stock came back to it; they knew that the Northern Central had had the benefit of the stock for its own purposes, and had had a handsome income from it, which in a large part had come from the P., W. & B. for some years, and that it would still have a controlling interest in it at a net cost of $50,000.00; they knew that the traffic furnished by the P., W. & B. was annually increasing, and that it was of the utmost importance to retain its patronage, and probably by that time had learned something of what is seen in still later days, that railroads are liable to make radical changes and adopt entirely new routes—diverting their traffic from former ones. No one can say that had it not been for the Act of 1906, prohibiting the construction of railroads in certain parts of Howard and Baltimore counties, much of the traffic over the Union road would not before this have been diverted, or that some route may not yet be adopted, in order to relieve the congestion and troubles incident to passing through a large city like Baltimore. In addition to all that the directors knew that the stock of the Union Company *had no market value,* for the simple reason that it could not be honestly sold to any company other than one or both of the other two in the Pennsylvania Railroad

System, or to that company itself, and that whatever value it had was dependent almost entirely upon the amount of traffic their own company and the P., W. & B. and the B. & P. furnished it.

Taking all of those circumstances into consideration, together with others mentioned in the main opinion, it is difficult to understand how it can be so persistently and confidently asserted that the sale made by those directors was fraudulent, or even unjust to the minority stockholders. Discreet business men do not hesitate to sell an interest in their business at less than it may appear to be worth, if its value be estimated by the amount of business, to those who have furnished much of that business, in order to retain their patronage, and sometimes in order to do what is simply just and right, to give them some return for what they have done and are doing—especially if under some moral, although no legal, obligation to do so. If it be true that Mr. Brooks sold the stock of the Union Company for less than it was worth, because Mr. Newcomer and others had impressed upon him the dangers of another line, as the appellees intimate, no stockholder of the Canton Company, which owned it, would charge him with fraud, or even with the lack of business sagacity for selling it,—although it was worth more. Yet the gentlemen who composed the Board of Directors of the Northern Central are charged with dishonesty (for that is what it means) because they did—not only what would simply be regarded as honest and just between individuals dealing under such circumstances, but what the plaintiffs and other stockholders might have condemned them for not doing, if such changes as railroads often make had been made, and the value of the Union Road had thereby been materially reduced. Of course we do not mean to say that directors are always at liberty to deal with their company's property just as they could with their own, but we do say that when they have authority to sell some of its property, and it is simply a question of price which is to be fixed, they are not required to ignore all business principles which should, and

do control honest individuals in their dealings with each other and all equities which enter into the transaction. If they sell for less than the real value (even though it may be for more than their company paid and for more than it is carried on the books of the company) it may be that their action is subject to a close scrutiny of the Courts, but unless fraud be shown or the Courts can see that they in some way abused the confidence and trust placed in them by the stockholders, they have no right to interfere.

But if there could possibly be any question about the right of the directors to act as they did, there can be no question about the right of the stockholders to sell the 5,000 shares at the price it was sold for, unless they acted fraudulently. At their regular annual meeting they acted on the report of the president and directors and adopted and approved that report, which explicitly referred to the sale, and the reason for making it, and the report had been previously published in three newspapers in Baltimore and sent to each stockholder. For aught that appears in the record every stockholder present, as well as many others who were not present, may have known the terms of the sale (as well as the fact of the sale, which they must at least be presumed to have known), and the only person who was at the time a stockholder who testified that he did not know of the terms was Mr. Minis, who was then owner of fifty shares, and admitted he was in the habit at that time of giving his proxy to others. That meeting was a year after the directors had made the sale (the report being for the year 1894, during which the sale took place) and surely if the directors did their duty, as they are presumed to have done in the absence of evidence to the contrary, not only those who were present and took part in the proceedings when the sale was ratified by the board, but all of them not only knew of the fact of sale but of the terms, as no director, who discharged his duties as the law required him to do, could have remained ignorant of the facts for the whole year before the stockholders met, and surely if there was fraud in the sale there was at least one honest director

in the board who would have informed the minority stock-holders. But not one complaint is shown to have been made until sixteen years afterwards when this bill was filed, and at a time when the receipts of the Union road were vastly larger than they were in 1894, owing in a great measure to the traffic of the P., B. & W. But as we have said, the shareholders present did ratify the sale by their action on the report, and that action was binding on the minority present as well as absent, unless there was fraud, and fraud has not been proven. Under the principles of law announced in the former opinion that is in our judgment conclusive of the question.

We confess our inability to understand the position taken in this brief as to the answers of the defendants being overlooked by the Court. No principle of equity procedure is better established than that the plaintiff must recover on the allegations of his bill and the evidence, and not on the defects or averments of the answer, except admissions. The plaintiffs distinctly charged in the bill that there was a sale, offered evidence to show that there was, and still so contend. Of course if exceptions are not filed to evidence, or it is not in some proper way objected to at the hearing, a decree may be based on the evidence alone, and under section 36 of Article 5 of the Code the defendant can not on an appeal rely on the fact that the evidence was not admissible under the allegations of the bill, unless exceptions are filed to it in the lower Court, but the plaintiff can not rely on the silence of the defendant in relation to any material allegation as an admission of its truth, but must prove it. So if the answer neither admits nor denies the allegations of the bill, or does not state the facts positively, or does state them inferentially the effect of the answer is to put the plaintiff to the necessity of proving the facts alleged in the bill. *Miller's Eq. Proc.* 199. If the answer is insufficient the remedy is to except to it. We do not understand the answers of the defendants to admit that this stock was worth $1,000 in 1894, but they in substance allege that the actual value was

not the question for consideration, but the circumstances they set up. In our former opinion we said that there was a sale to the Northern Central, and that the stock was, under existing conditions if they be continued, worth more than $110.00 a share, but we held, as we still hold, that such peculiar circumstances as are proven in the case can be considered in determining whether the directors were justified in selling at the price at which they did sell, and unless there be fraud the mere fact that the sale was made for less than the value, real or apparent, does not justify the interference of a Court of Equity.

Nor do we find any ground for the criticism of the references in the opinion to the charges being burdensome. We mentioned the dividends which had been declared,—finally reaching 50 per cent. on the increased capital. As the P., W. & B. was contributing over 40 per cent. of the earnings of the Union Company in 1893, when that company paid 35 per cent. dividends and was accumulating from year to year other sums with which it in 1895 paid off $900,000.00 of first mortgage bonds, can it be doubted that the charges it was paying were burdensome? In the nine years prior to the filing of this bill, the P., B. & W. and its predecessor contributed to the Union Company over five millions of dollars for the use of a few miles of tracks—the appellees say nine miles, but according to the statements filed the average hauls were much less and judging from the maps filed the P., B. & W. would not have to use anything like nine miles in its through shipments. Of course it was not then so material what it paid, as it was getting returns in dividends, but if the stock had not been sold to it, and it had continued to use that road at the rates it was paying, it is useless to say they were not burdensome. It may be that as the Northern Central was principally hauling such articles as coal, etc., it paid more per car than the P., W. & B., but it doubtless received more per car. If, to use the illustration given in the appellees' original brief, the freight from Harrisburg to tidewater at Baltimore for coal was $1.00 per ton and the

rate on fruits, vegetables, etc., was $2.00, and a carload of coal contained 40 tons, while one of vegetables or fruits only 10 tons, while the Northern Central at 20 cents per ton would pay $8.00 and the P., W. & B. only $2.00 per car, the Northern Central would receive $40.00 freight and the P., W. & B. $20.00 per car. But without continuing the discussion of this point, the evidence does in our judgment show that the rates were burdensome, although that was only one of a number of reasons which might have induced the directors to make the sale, and of course it was not material to the Northern Central, if it got back the amount of the charges as the holder of the stock.

We did not deem it necessary to discuss the exceptions to the evidence, as we thought our views of them could be sufficently understood from what we said in the opinion. Under the view we took of the case the evidence in reference to repayments to the P., W. & B. by the Northern Central in 1890-1893, was for the most part useless, and did not influence our conclusion. We deemed evidence in reference to the negotiations for the original purchase and the subsequent sale of the 5,000 shares admissible, as reflecting upon the understanding of the parties, which in turn reflected upon the question of fraud. It was unnecessary therefore to take up each exception separately. The brief filed in this case in support of the motion for reargument contains many inaccuracies and in some instances does not correctly state the position of the Court or what it said, but we will not refer to them further.

A supplemental brief was recently filed, in which it is sought to show that the sale by the Northern Central "to equalize the apportionment" was *ultra vires* and the case of *Western Maryland R. R. Co.* v. *Blue Ridge Hotel Co.,* 102 Md. 307, is said to be conclusive of the point. We confess our inability to see the analogy between the two cases. The railroad covenanted with the hotel company that if in any one year the actual net earnings of the hotel company from the hotel, built by it near the line of the railroad company,

and other sources, were not sufficient to pay 5 per cent. dividend upon its capital stock of $100,000.00, and 6 per cent. interest on its bonds not to exceed $125,000.00, the railroad company would pay "such commissions upon its receipts from traffic to and from Blue Mountain and Pen Mar Stations, or any other station or stations which may be hereafter substituted for either, or both, of the above, at which the business hereby contemplated may be done, as will be sufficient to make up said deficit to five per cent. upon its capital stock, and six per cent. per annum upon its bonded debt." We held that the contract was *ultra vires* and void because the railroad company had no power under its charter to guarantee the payment of interest and dividends of a hotel company, and that it made no difference that the payment was called commission on traffic receipts from and to certain stations. In the course of the opinion JUDGE PEARCE, who considered the various aspects of the case with his well known ability and thoroughness, said: "There is no limit to the rate of commission to be paid. The full amount of the gross receipts from these two stations was pledged by that covenant if required to make good this deficit * * * A contract which in effect pledges the total gross receipts from any source, can not be regarded as a contract for *commissions on,* or, a *rebate from* those gross receipts, and this contract must be regarded as an absolute guaranty to the stockholders and bondholders of the hotel company of their dividends and interests to the extent to which the receipts from the stations named should be adequate for that purpose, since in the language of the contract, the payment was to be made 'to the hotel company *for its stockholders and bondholders.*' " The opinion said it was a collateral contract, but added that, "it would make no difference so far as its validity is here concerned, if it had been an original contract to pay the hotel company a lump sum upon the consideration stated." It then went on to show that neither the original charter nor the amendments gave the railroad company any power, express or implied, either to engage directly in the construc-

tion and operation of a summer hotel, or to lend its credit
to any other corporation engaged therein "while the Acts of
1872 (Ch. 71) and 1884 (Ch. 153), *supra,* seem to us, by
their express limitation of the powers granted to dealing with
railroad companies or companies 'owning a railroad and
other property,' to exclude the power to engage in any other
business than that of a railroad, or to gurantee the obliga-
tions of any other corporation than a railroad corporation."
The effect of an *ultra vires* contract being partly executed
was then considered.

We have thus quoted from and referred to that well known
case at length because the attorneys for the appellees rely on
it for the point now under consideration, and say that no
distinction can be drawn between that and this case. We
did not discuss this particular question at length in the
former opinion, but contended ourselves by saying "if it
was *ultra vires* to sell a part of the stock to a connecting road,
it must have been *ultra vires* to buy it, unless there was some
special power to buy and no power to sell a part." In *Booth*
v. *Robinson,* 55 Md. 419, referred to in the former opinion
on other points, one question was as to the power of the
Baltimore Steam Packet Company to purchase and hold the
stock of the Powhatan Steamboat Company. It was con-
tended that it could not be done without express authority
of law. JUDGE ALVEY, in delivering the opinion of the Court
said: "But while some Courts have so held, the great weight
of authority is the other way. There is nothing in the
charter of the Steam Packet Company, or in the nature of
its business, that would, in the slightest manner, forbid the
exercise of such power; and having money to loan or invest,
there would appear to be no good reason why it might not
invest in the stock of other corporations as well as in any
other funds, provided it be done *bona fide,* and with no
sinister or unlawful purpose." After saying that at one time
the Courts of England strongly opposed the right of one
corporation to deal or invest in the stock of another without
express authority, he said: "But that opposition has been

entirely overcome, and it is now settled there that one cor-
poration may deal in the shares of another, without express
authority so to do, unless where expressly prohibited or the
nature of its business render it improper so to do." In
*Davis* v. *U. S. E. P. & L. Co.,* 77 Md. 35, the latter state-
ment, quoted from *Booth* v. *Robinson,* was repeated as the
settled law of this State on the subject.

It has not been suggested that either the Northern Central
or the P., W. & B. was prohibited 'from holding stock in
another company, and there can be no doubt that under our
decisions they could do so, provided they did so *bona fide*
and without any sinister or unlawful purpose. It certainly
will not be denied that, if a corporation can purchase and
hold shares of stock of other corporations it can sell them,
or a part of them, if necessary or it be deemed desirable,
indeed the language of the Court in the two cases cited above
is *"may deal* in the shares of another,"—for it would take
away one of the ordinary and most important incidents to
the ownership of property to withhold from a corporation,
as owner of stock, the power to sell it, unless it would inter-
fere with some duty it was under obligation to perform, and
it would in many cases be disastrous to the interests of all
concerned if it could not sell such stock as it held. In the
*Western Maryland R. R. Co. Case* the company had no
power to do what it undertook to do, while in this case both
companies had the power to buy and sell the stock of the
Union Company, which was undoubtedly to their interest,
and not being a competing road, but a link in their system,
such ownership was not only not objectionable but very
desirable. There is, therefore, a radical difference between
the two cases.

But it is said that the Northern Central had no power to
sell the 5,000 shares to the P., W. & B., "in order to induce
the latter company to furnish or continue to furnish the
traffic in question," and that "in consideration of this fact,
as the resolutions show, the stock was delivered to the P., W.
& B.; the latter not being required to pay for the same, but

being only required to pay a sum of money amounting to five hundred and ten thousand dollars ($510,000.00), 'to equalize the apportionment.' That such a contract or agreement and such a payment were *ultra vires,* for the reason that the Northern Central Railroad had no *legal right or power* under its charter to use or agree to use its resources for such a purpose, however beneficial it might be from a business standpoint to do so, can not be denied under the law of Maryland as settled by the decisions of this Court." (The counsel inadvertently named the sum of $510,000.00 instead of $550,000.00, which was the amount paid.) The only authority cited for that statement is the *Western Maryland R. R. Co. Case,* and as we understand that case and other decisions of this Court, we can not admit that such is the law of this State. We are now speaking of the question of *ultra vires,* and not what we deem the important question which we have at such length discussed in this and the other opinion. One objection urged by the Courts which have denied the right of one corporation to deal in the stock of another is that it would lead to speculation, and jeopardize the property of the holding company and its ability to perform its corporate duties. It was certainly not incumbent on the Northern Central to hold this stock for speculative purposes, and when it sold five-twelfths of 5,000 shares of the stock held by it at $10.00 per share more than it paid when there were only 6,000 share (the additional 6,000 not having cost it a penny), and still retained a controlling interest in the company at a net cost of $50,000.00, it can not be properly said that it was making an improper use of its resources, or that it had no legal right or power under its charter to make the sale—although it was induced to sell it in order "to equalize the apportionment," or, as the report which was approved and adopted by the stockholders said: "In order to give the companies contributing traffic to the Union Railroad Company of Baltimore an ownership based on the amount of said contributions." If it had the power to purchase and sell, as it undoubtedly had, the fact that such was the induce-

ment for it to sell certainly could not deprive it of the right to do so. There was nothing illegal in such an inducement, but on the contrary, as we have shown above and in the other opinion, it might very well have been deemed the wise and proper thing to do, not merely in justice to the purchaser for reasons we have stated, but for the interest of the Northern Central.

So this brings us back to what we have already so fully discussed and we will not discuss it further, except to repeat what we have said or indicated, that the appellees have not given the action of the stockholders at the annual meeting in February, 1895, the force and effect it is in law entitled to. None of the judges who sat in the case, who gave it their best consideration before it was decided and have since carefully considered this motion, have any doubt as to the correctness of the conclusions reached, and the motion must therefore be denied.

*Motion for reargument overruled.*