EASTERN ROLLING MILL COMPANY *v.* SIMON
MICHLOVITZ ET AL.

[No. 22, January Term, 1929.]

52

*Decided March 20th, 1929.*

The cause was argued before Bond, C. J., Urner, Adkins, Offutt, Digges, Parke, and Sloan, JJ.

*Charles Markell,* for the appellant.

*Edgar Allan Poe,* with whom were *Bartlett, Poe & Claggett* on the brief, for the appellee.

Parke, J., delivered the opinion of the Court.

The plaintiffs, Simon Michlovitz, Abram Michlovitz, and David Furman, are copartners trading as Michlovitz & Co., and carry on an extensive wholesale business in buying and selling iron, steel, and other scrap at Harrisburg, Pennsylvania, where their office and two of their yards are located. They have two other yards at Lebanon, which is in the same state and twenty-five miles from Harrisburg. The defendant, the Eastern Rolling Mill Company, an incorporation of the State of Maryland, with its principal office in Baltimore and its plant either in that city or in its environs, is a manufacturer of sheet steel, and its processes leave for disposal a large quantity of what is known to the trade as "crop end

scrap" and "bundled steel scrap." The first is the ends of steel bars, which are the raw material of the industry; and the second is the ends of steel sheets, which the defendant hydraulically compresses into bundles for sale as scrap. The steel sheets constitute ninety-eight per centum of the gross money value of the corporate business, and the other two per centum is, practically, the two kinds of scrap mentioned.

Since the defendant began operation in 1920, the defendant had exclusively disposed of this scrap to the plaintiffs. The yearly output of scrap was large, the transactions between the parties satisfactory, but periodic contracts for more than three months for the entire accumulation of both kinds of scrap began, apparently, on December 1st, 1922, when the parties agreed to a sale and purchase of an entire thirteen months' production at a flat rate per ton for each kind as delivered by the defendant on gondola railway cars at its plant, when it was to be removed without delay by the plaintiffs. However, the prices agreed did not remain in force throughout the period, as they were voluntarily increased by the plaintiffs, after a conference, for the deliveries during the second and third quarters of that year. On November 30th, 1923, the parties again agreed in writing. The contracts were similar to those for 1923, except that the term was for five years, beginning on January 1st, 1924, and ending on December 31st, 1928; and that the prices were not specified but were to be agreed upon by the parties at the beginning of every period of three months during the life of the contract. Before the expiration of these contracts, the parties cancelled them on September 15th, 1927; and superseded them by two new written contracts, each for the period of five years from the 1st day of October, 1927, to the 30th day of September, 1932, inclusive. The only practical difference between the two contracts is that the subject matter of one is crop end scrap and of the other is bundle steel scrap, so only the terms of one need be stated.

By these contracts, the defendant agreed to sell its entire accumulation of the two kinds of scrap during the period of five years at prices to be fixed at the beginning of every

quarter for the next succeeding three months in the following manner: The plaintiffs were to accept delivery of the scrap as it accumulated, and its price, when loaded by defendant on gondola cars at its plant, was, (a) with respect to the pressed bundled sheet steel scrap, three dollars a ton less than what was quoted in the "Iron Age," a trade publication, at the beginning of every quarter, as the Philadelphia market for bundled steel sheets; and, (b) with respect to the crop end scrap, three dollars a ton less than what was quoted in said journal, at the beginning of every quarter, as the Philadelphia market for No. 1 heavy melting steel. The contracts required the plaintiffs to pay $5,000 on account of both contracts at the time of their formation; and the defendant agreed to give credit to this amount on the scrap to be delivered, the plaintiffs promising to pay whatever was in excess of this sum in accordance with the terms then in force between the parties.

These contracts went into effect according to their stipulations; the plaintiffs paid to the defendant the required $5,000; the prices for bundled sheet steel scrap and for crop end scrap were fixed on September 29th, 1927, in accordnace with the provisions of the contracts, for the ensuing last quarter, October, November and December, 1927; and the scrap for this quarter was regularly delivered by the defendant and paid for by the plaintiffs. No controversy of any kind arose until the death of John M. Jones, who had been the president and general manager of the defendant from its inception, and who, in these capacities, had made with the plaintiffs all the contracts for the sale of scrap to the plaintiffs. Jones died about November 1st, 1927, and in the following month, under the direction of A. J. Hazlett, the new president, an effort was made to induce the plaintiffs to agree to a rescission of the contracts. The defendant's objection to the contracts was their duration and the prices, but it was willing to enter into new contracts for not over a year, upon the other terms, including the prices, of the original contracts. The defendant charges, but the plaintiffs deny, that the plaintiffs assured the defendant of

their willingness to rescind the subsisting contracts and to enter into similar ones for a short period. The defendant's contention is not supported by the weight of the evidence; and there can be no doubt that there never was any agreement between the parties for any modification of the contracts in controversy. In performance of these contracts, the defendant and plaintiffs agreed in December, 1927, upon the prices for scrap for the ensuing first quarter of the year, and, similarly, agreed in March, 1928, upon the price basis for the second quarter, and, accordingly, the defendant delivered, and the plaintiffs received and paid for, all the scrap which accumulated during the first six months of 1928.

Since the June, 1928, deliveries, the defendant has refused to comply with its contracts, although the plaintiffs have demanded their performance, and the defendant does not question plaintiffs' willingness and ability to complete and discharge fully their obligations. Under these circumstances, and because of the alleged irreparable loss and injury to the plaintiffs resulting from the defendant's refusal to fulfill its continuing contracts, the plaintiffs brought a bill to enforce specifically the contracts. After answer, and the taking of proof by the parties in open court, the chancellor decreed the relief prayed for, and this appeal raises the question of the right of the plaintiffs to relief.

When the defendant determined, in November or December, 1927, to obtain a termination of the contracts by cancellation or by the reduction of their term, it was aware of all the grounds upon which it now relies to avoid the contracts, so all the successive acts of performance on the part of the plaintiffs and of the defendant, respectively, were alike referable to the subsisting contracts; and, even if it be conceded that these acts were done pending an abortive effort to cancel the contracts or to secure a modification of the period of the contracts by way of compromise, it is nevertheless difficult to see how—under the evidence and in the absence of any agreement between the parties to the contrary —these facts did not amount to an election on the part of the defendant to abide by and perform the contracts, there

being no conduct nor other circumstances which would estop the plaintiffs from asserting the election to have been then made.

The defendant, however, makes the first point that the contracts sought to be enforced are *ultra vires* and void, and, if this contention be sound, the corporate defendant could not make the contracts *intra vires* by electing to perform them. It will, therefore, be necessary to consider the theory that the contracts were *ultra vires*, and with it all the other defences interposed will now be examined.

The defendant's argument involves the maintenance of a number of propositions. In the first place, the right to a specific performance is denied because the contracts of September, 1927, are either (*a*) *ultra vires*, or (*b*) are not within the authority of the defendant's president and general manager to make; or (*c*) are fraudulent; or (*d*) so unconscionable as not to be specifically enforceable. And, secondly, the defendant asserts (*e*) that the plaintiffs have an adequate remedy at law, and (*f*) that the defendant would be harmed more by being required to perform the contracts than the plaintiffs would be benefited.

In the defendant's certificate of incorporation, the first of the declared corporate objects and business is the manufacture and sale and dealing in any way in "steel sheets and all by-products resulting from the manufacture thereof." So there can be no question that the sale of not only the steel sheets, but also the scrap, a by-product of the manufacture of steel sheets, is fulfilling one of the prime purposes of the incorporation of the defendant, and, therefore, wholly and irrefutably *intra vires*. Nor is there any limitation in the charter of the defendant with respect to the period its contracts may run, nor any prescription as to their content. It follows that the duration and other terms of a contract of sale by the defendant of a product of its business will not generally render the contract *ultra vires*, although it is conceivable that, under special circumstances, the length or other terms of a particular contract of sale might make it *ultra vires*. But certainly lack of judgment in writing a

contract for a period of five years instead of less, and in agreeing on one price, instead of a higher, for the period, will not render a contract *ultra vires*. And any contract which is *intra vires* as to the corporation is assuredly none the less so when made by its duly constituted agent within the scope of his authority, whether expressly given or duly implied.

The general management and control of the affairs of the corporation were vested by the certificate of incorporation in its board of directors, who exercised all of the powers of the corporation except such as are expressly limited by law to the stockholders. The corporate by-laws provided for a president and that he should be the chief executive officer of the corporation, having general and active control of its affairs and business, subject to the authority of the board of directors. The by-laws specified that the general manager of the corporation should perform such duties as may be prescribed by the board of directors or executive committee, or as might be fixed by special contract, and that he, as well as the other corporate officers, should perform such duties and exercise such further powers as may be delegated to him by the board of directors or by the executive committee. There was a further provision of the by-laws that all contracts, made in the conduct of the ordinary business of the company, for purchases and sales, may be signed by the officer having authority to transact the business, or within the scope of whose duty the transaction may in each particular instance fall.

From its beginning, the president and general manager of the defendant was J. M. Jones, whose services began under a contract of employment which ran for eight years, and which imposed upon him, subject only to the direction of the board of directors, the initiation, operation and general management and control of the organization and business of the company. Jones successfully launched and managed the corporate affairs in accordance with this contract, which expired on July 2nd, 1927, and, before its expiration, he and the defendant entered into another contract for a

like period of eight years from July 2nd, 1927, whereby he continued in the corporation's service and agreed to assume as theretofore full charge of the business of the defendant and the operation and control of its plant, and of its organ- . ization as president and general manager thereof, subject only to the direction of the board of directors of the company.

In the performance of his duties, the board of directors imposed neither restrictions nor limitations upon the sales of its products; neither did the board require that any contract of sale should be subject to the condition of its approval, nor did it abridge in any particular the manager's general and universal power of sale. From the time the defendant began its operations, the general manager had sold and delivered to the plaintiffs all of the scrap here involved under successive contracts, whose length was, at first, for periods of three months, then for thirteen months, and next for five years. The prices agreed to be paid for the scrap in these several contracts was usually fixed at a constant figure for every ton, but, in the first contract for five years, it was stipulated that the price should be agreed upon by the parties, at the beginning of every quarter, for the ensuing three months. So far as the defendant was concerned, the agreement with respect to the duration, the price of the scrap, and all the other terms of every contract were not submitted to the directors of the company but were left exclusively to the judgment, discretion and decision of the president and general manager, who, after agreeing on the stipulations of the contracts, executed them in the name of the company; and any change or modification of their provisions was recognized to be his province.

When, therefore, the president and general manager proposed to the plaintiffs that the defendant enter into the two contracts here in question for a like period of five years at prices which were to be determined, at the beginning of every quarter, for the ensuing three months, by deducting three dollars from the prices for the Philadelphia market, as quoted in the Iron Age, for bundled steel sheets and for heavy melt-

ing steel, as determinative of the contract prices, respectively, of defendant's production of hydraulic compressed bundled steel scrap and crop end scrap, the proposition was apparently a normal transaction within the scope of a general manager's authority. The new contract superseded a contract of five years (Williston on Sales [2nd Ed.], sec. 167), which would soon expire and under which the prices paid by the plaintiff to the defendant for its scrap averaged $3.37 less than the specified quotations on the Philadelphia market, so there was nothing in the duration or prices of the proposed contracts, or the manner of their submission and execution, which was unusual, or which would put the plaintiffs on notice that this new contract must be negotiated and executed in any manner different from those of the past. As was said in *Carrington v. Turner,* 101 Md. 437, 443; "It is well settled that a corporation may confer upon its officers or agents larger power than ordinarily belongs to them by holding them out to the public as possessing such powers by habitually permitting them to exercise them." *Santa Clara Mining Assn. v. Meredith,* 49 Md. 389, 400; *Equitable Endowment Assn. v. Fisher,* 71 Md. 439; *Hadden v. Linville,* 86 Md. 210, 230-233; *Maryland Trust Co. v. Mechanics' Bank,* 102 Md. 608, 634, 635.

So, under the facts and circumstances of this case, it is plain that the president and general manager, in making the assailed contracts, was acting within the scope of his duties, and for the benefit of the defendant, in a matter which arose in the course of the ordinary business of the corporation. The following quotation in the case of *Eastern Shore Brokerage Co. v. Harrison,* 141 Md. 91, at p. 100, is apposite to the facts of this record: "Unless his authority is specially restricted, the authority and power of a general or managing officer or agent are co-extensive with the powers of the corporation itself, and he has authority to do any act on its behalf which is usual and necessary in the ordinary course of the company's business, or which he is held out to the public as having authority to do, and may exercise all the powers which the board of directors could exercise or authorize under

the same circumstances in the general management of the corporation business."

As has been seen, the board of directors gave the general manager no direction, and placed upon him no limitation, with respect to the contracts of sale for its products, but customarily left these matters to his sole discretion and decision, without ever exercising any supervision, much less control. Under these circumstances, the corporation is not in a position to set up a want of authority in its general manager. It was charged with the knowledge of the extent of the power commonly exercised by its general manager in the conduct and management of its business, even though such power had not been expressly delegated to the manager. *Supra,* and *Buchwald Transfer Co. v. Hurst,* 111 Md. 577; *Sun Printing & Publishing Assn. v. Moore,* 183 U. S. 642, 650; *Hagerstown Brewing Co. v. Gates,* 117 Md. 348, 358-361; *Md. & Del. R. R. Co. v. Porter,* 19 Md. 458, 469; *Northern Central Ry. Co. v. Bastian,* 15 Md. 494, 500, 501; *Singer Const. Co. v. Goldsborough,* 147 Md. 628, 632, 633; *Williston on Contracts,* sec. 277.

Since the general manager, while acting within the scope of his authority, made the contracts in the name of the principal, and in its behalf, the latter is bound to perform the contracts according to their terms, unless the contracts were fraudulent, as the defendant now maintains. The reason for this rule is expressed in the maxim *qui facit per alium facit per se.* So, no matter if the terms of the contracts be improvident, the principal is bound as if the errors of judgment of the agent had been made by the principal, unless the agent were guilty of fraud in making the contracts.

The evidence is clear and convincing that there was no fraud. The direct testimony is that the general manager, Jones, had no ulterior interest in the formation of the contracts, and that he derived no personal benefit from their making or performance other than which inured to him as a large stockholder in the company. It was not until after his death that defendant attempted to annul the contracts. For a number of years, and until his death, he had been

the defendant's trusted and efficient chief executive officer, and his conduct of its affairs had been thoroughly satisfactory and profitable; and it is no more than just to state that this record presents no facts affecting his integrity. In the absence of direct evidence, the defendant relies upon an inference of fraud from what is claimed to be the patent unfairness of the contracts, so far as the defendant is concerned. The charge of fraud rests, in last analysis, upon the duration of the contracts and the prices agreed to be paid for the scrap. The argument that the length of the contracts in dispute is abnormal and unprecedented, and so unfair, loses some of its force in view of the fact that the executed contracts between the same parties that immediately preceded them were for a like term of five years. Again, the prices for the scrap were not at a specified and constant figure during the life of the contracts, but were variable units which depended upon the quarterly changes in the market value of certain scrap and fluctuated with, and always three dollars less than, the market prices as they reflected, from quarter to quarter, the current worth of the materials. So, as the plaintiffs are financially responsible and have demonstrated for many years their ability and dependableness in the performance of their obligations to pay for and to remove quickly the scrap, the length of the contracts becomes immaterial, and the charge of fraud is seen to rest, finally, upon the prices of the scrap being determined by the quarterly reduction of the two specified market quotations by three dollars. The defendant contends that this secures to the plaintiffs such an unconscionable and extraordinary profit as to be fraudulent in law.

The defendant's production of scrap was from one to two carloads a day, and its switch facilities required the prompt removal of the loaded cars. For many years the defendant, through its general manager, had bargained and sold its scrap to the plaintiffs, who had uniformly moved the cars away without delay, and had paid for the scrap promptly. So, from an operative and financial standpoint, the business relations with the plaintiffs had been satisfactory. In order

to secure the continuance of this service with respect to the regular removal of the scrap and the certain and prompt use of the purchase price in the business, whether the plaintiffs had a ready market for the scrap or had to put it in storage, the general manager proposed contracts for five years, and the method of determining in advance the prices for the succeeding quarter. The average prices which had been paid for the preceding four years were $3.37 less than the prevailing quotations from quarter to quarter, so the offer was made for new contracts under which $3 should be the amount to be subtracted from the quotations at the beginning of the quarter. This was a gain of 37 cents a ton for the defendant. The deduction of $3 to be made was to cover a minimum freight charge of $2.27 a ton to its yards and to every market within the territory known as the "Philadelphia Market," except to the Bethlehem Steel Company at Sparrows Point; and to take care of the plaintiffs' overhead, probable unloading and loading charges, and freight in reshipment after storage, and the risks incident to the business, and a net profit to the plaintiffs.

At the time of the contracts, the Bethlehem Steel Company was not taking any scrap from the plaintiffs, but the plaintiffs and the general manager knew that, if the latter company did buy the scrap of the plaintiffs, their chances of profit would be materially increased, as the freight rate per ton to Sparrows Point was but 90 cents. As against the probability of the Bethlehem Steel Company buying some or all of the scrap, there was the chance that it would not do so, and that the plaintiffs would, during the period of five years, have markets where the delivery would be $2.27 per ton or more for freight, or, perhaps, have to store the scrap at great loss because of no demand. Furthermore, while the steel company would likely have to pay the plaintiffs the market price for the scrap, yet there was then no assurance that, if the defendant refused to sell to the plaintiffs, the steel company would buy all the scrap of the defendant, remove it promptly, and bind itself to pay defendant the full market price for five years. In addition to this,

the defendant was buying its steel bars of the steel company, and the defendant's general manager did not consider it sound business policy to sell defendant's scrap to the manufacturer from which it bought its raw material. He thought it best for his company not to be dependent upon the steel company for the sale and removal of the scrap. There were obvious advantages and disadvantages to the defendant, no matter which choice the general manager made. It was his duty to act, and in this he necessarily exercised his judgment, and his decision must be weighed in the light of the circumstances at the time and not by the subsequent developments.

The witnesses who testified held different opinions of the advisability of the contracts, which illustrates that there was ground for an honest difference of opinion. The terms of the contracts have yielded thus far a handsome profit to the plaintiffs, yet these same terms would not have been near so profitable, if at all, had the Bethlehem Steel Company not resumed its buying of scrap. Moreover, it is not impossible for the plaintiffs to lose heavily, if, in the future, their market for the scrap should fail, and they would have to store it on their yards. Upon such a contingency, and others which could be used for the purpose of illustration, the sound business judgment of the general manager would be vindicated, and the acumen with which the plaintiffs are now credited would vanish. Where so many uncertain and contingent factors entered into the equation, a court can not find any justification for declaring that the prices agreed, in connection with all the circumstances, were so unconscionable as to establish constructive fraud of which the third party had notice. The prices were the result of negotiations, untainted by collusion or fraud, and, at worst, they were a default or error of judgment of one or the other of the parties accordingly as the future would determine the conditions under which the contract would be performed. The testimony has convinced the court that the general manager can not be charged with anything more serious than an error of judgment, and that he and the plaintiffs were in a position, and

had the knowledge, power and ability, to agree, and did agree, through the exercise of their independent judgment,. as to the value of the scrap, and how it was to be measured. If any mistake were made, it was an honest one, for which the defendant is responsible as principal. See *Penna. R. R.. Co. v. Minis,* 120 Md. 496, 502, 503, 505; *Matthews v. Headley Chocolate Co.,* 130 Md. 523, 535; *Foutz v. Miller,* 112 Md. 458, 461. It follows that the defendant has not met the burden of proving fraud on the part of its general manager in the making of the contracts in question nor that the contracts were unconscionable in their terms. *Booth v. Robinson,* 55 Md. 419, 436-441; *Penna. R. R. Co. v. Minis,.* 120 Md. 461, 485-486.

The present appeal does not fall within that class of cases. where the inadequacy of consideration, either alone or in association with other inequitable circumstances, is so gross: as to shock the conscience and furnish satisfactory and decisive evidence of fraud. *Pomeroy's Equitable Juris.* (4th ed.), secs. 925-928. On the contrary, the evidence, in our opinion, establishes it as a case where a corporation, through its agent, acting within the scope of his employment and in behalf of his principal, has made contracts, without mistake, misapprehension, or fraud, and because the defendant thought best to enter into it, and meant to enjoy the full benefits of it; but now, conceiving the terms of the contracts: to be to the disadvantage of the defendant, seeks to be rid of their performance. The law, however, enforces a contract without concern whether the valid promises of contracting parties were wisely made or will result profitably or unprofitably.

The nature of the contracts attacked has been disclosed by the preceding discussion, so, without stopping to set out the points made by the defendant why the relief of specific performance should not be granted, and presenting and analyzing the pertinent evidence on this question, it will be sufficient to say that, in the court's judgment, the contracts. are shown to have been fair, equal, and just at the time of their inception, when the parties, with equal knowledge and.

means of obtaining knowledge of all the material facts, and with a common opportunity of judging their consequences, must be assumed to have contemplated and provided against all possible contingencies. Nor does the evidence prove that the enforcement of the contracts for the residue of its term would be oppressive. *Rogers v. Dorrance,* 140 Md. 419, 426; *Lucas v. Long,* 125 Md. 420, 427; *Liggett Co. v. Rose,* 152 Md. 146, 168, 169; *Willard v. Tayloe,* 8 Wall. 571; *Fry on Specific Performance* (6th ed.), secs. 389, 418; *Franklin Tel. Co. v. Harrison,* 145 U. S. 459, 472, 473; *Morley v. Clancy,* 29 Beav. 84, 54 Eng. Reprint, 558.

In the present case, section 246 of article 16 of the Code has no application, since the defendant's proof satisfactorily showed that the defendant has property from which the plaintiffs may recover any damages and costs which might be adjudged for a breach of the contracts, therefore, apart from statute, Code, art. 83, sec. 89, the court as a general rule will refuse to decree specific performance in respect of chattels because damages are a sufficient remedy. This principle does not apply in all cases of chattels, so there are many exceptions to this rule, because, principally, of the inadequacy of the remedy at law in the particular case, or of the special nature and value of the subject matter of the contract. Passing by other illustrations of the exceptions to one more clearly in point, *Pomeroy on Specific Performance* (3rd ed.), sec. 15, puts it thus: "Again, contracts for the delivery of goods will be specifically enforced, when by their terms the deliveries are to be made and the purchase price paid in installments running through a considerable number of years. Such contracts 'differ from those that are immediately to be executed.' Their profits depending upon future events, cannot be estimated in present damages, which must, of necessity, be almost wholly conjectural. To compel a party to accept damages under such circumstances is to compel him to sell his possible profits at a price depending upon a mere guess." This statement of the law is supported by the Maryland decisions. *Equitable*

*Gas Light Co. v. Baltimore Coal Tar Co.,* 63 Md. 285, 299, . 300; *Gottschalk v. Stein,* 69 Md. 51; *Ady v. Jenkins,* 133 Md. 36, 40; *Baltimore Process Co. v. My-Coca Co.,* 144 Md. 439, 449-450; *Thompson v. Winterbottom,* 154 Md. 581; *Sullivan v. Tuck,* 1 Md. Ch. 59. Compare *Thorn v. Commissioners of Works,* 32 Beav. 490; *Taylor v. Neville,* cited, . 3 Atk. 484; *Ball v. Coggs,* 1 Bro. P. C. 140 (Toml. Ed.); *Furman v. Clark,* 11 N. J. Eq. 306; *Owaba Lumber Co. v. Co-operative Inv. Co.,* 55 Colo. 271.

Under the cases, the right to specific performance turns upon whether the plaintiffs can be properly compensated at law. The plaintiffs are entitled to compensatory damages, and if an action at law cannot afford them adequate redress, equity will specifically enforce the contracts, which would not impose upon the court any difficulties in enforcement, as the subject matter of the contracts is the accumulated scrap at the plant of the defendant. The defendant relied upon the case of *Fothergill v. Rowland,* L. R. 17 Eq. 132, but there the contract was one whose performance involved the working of a coal mine, which required personal skill, and this, with its different facts, distinguishes that case from the one at bar. The goods which the parties here had bargained for were not procurable in the neighborhood and, moreover, they possessed a quality and concentrated weight which could not be secured anywhere within the extensive region covered by the "Philadelphia Market." In addition, the delivery of the scrap at Baltimore was one of the valuable incidents of the purchase. It follows that the right to these specific goods is a consideration of great importance, and this and the difficulty of securing scrap of the same commercial utility are factors making for the inadequacy of damages.

The scrap is not to be delivered according to specified tonnage, but as it accumulates, which in the past has been at the rate of one and two and occasionally three car loads of scrap a day, so the quantities vary from quarter to quarter. If the plant should cease to operate or suffer an interruption, there would be no scrap accumulating for delivery under the contracts, and its deliveries would end or be les-

sened. Neither are the prices for the scrap constant during
the period of the contracts, but change from quarter to quar-
ter according to the quotations of two specified materials on
the Philadelphia market whose quarterly prices are accepted
as the standards upon which the contract prices are quar-
terly computed. The contracts run to September 30th, 1932.
By what method would a jury determine the future quar-
terly tonnage, the quarterly contract price, and quarterly
market price, during these coming years? How could it
possibly arrive at any fair ascertainment of damages? Any
estimate would be speculative and conjectural, and not, there-
fore, compensatory. It follows that the defendant's breach
of its contracts is not susceptible of fair and proper com-
pensation by damages; and that to refuse to compel the
defendant to do merely what it bound itself to do, and to
remit the plaintiffs to their action at law, is to permit the
defendant to relieve itself of the contracts, and to force the
plaintiffs to sell their profits at a conjectural price. To sub-
stitute damages by guess for due performance of contract
could only be because "there's no equity stirring."

The equitable remedy of specific performance is indicated
by the facts and circumstances; and would seem to be author-
ized by section 89 of article 83 of the Code, providing as
follows: "When the seller has broken a contract to deliver
*specific or ascertained goods,* a court having the powers of a
court of equity may, if it thinks fit, on the application of the
buyer, by its judgment or decree, direct that the contract
shall be performed specifically without giving the seller the
option of retaining the goods on payment of damages. The
judgment or decree may be unconditional, or upon such
terms and conditions as to damages, payment of the price
and otherwise, as to the court may seem just."

The goods in the instant case are all of the daily by-prod-
uct of the raw materials used in the manufacturing proc-
esses of a particular plant. The goods assume their distinc-
tive form of scrap and are of a known quantity and quality
when the raw material has been made into the commercial
product; and they are identified by reason of their location

68

in the plant where they were manufactured. The defendant does not perform its contracts by delivering any scrap other than that agreed upon, that is, the scrap made .and accumulated by a particular manufacturer as the by-product of the operations of a specified manufacturing plant. If the contract had been for generic goods, the defendant could deliver any goods which answer to the description. The term "specific goods" is defined to mean goods identified and agreed upon at the time a contract to sell or a sale is made. Code, art. 83, sec. 97. It is not necessarily confined to existing goods, but may embrace future goods which were unascertainable at the date of the contract, if they be so susceptible of identification and appropriation by description as to be clearly ascertainable when the contract comes to be enforced. So "specific" has been held to apply to future and unascertained goods, if they are the product of what is specific. This principle is illustrated by *Howell v. Coupland* [1876], 1 Q. B. Div. 258, where defendant agreed to sell plaintiff 200 tons of potatoes grown on land belonging to defendant at a particular place. At the time of the agreement the ground had been prepared, but the potatoes had not been planted, but were put out and should have produced the agreed quantity. Without any default of the defendant, disease reduced the crop to about eighty tons. The question was whether the defendant had performed his contract by the delivery of the eighty tons, and its solution hinged on whether this agreement for the delivery of future goods was a sale of specific goods. The court held that, inasmuch as the contract was for potatoes off specific land, it was therefore a contract for a part of a specific crop, although it was not planted at the time of the contract; and that, because the specific goods had perished without the fault of the seller, he was not bound to deliver the 200 tons, as he would have been if the sale had not been of specific goods. *Benjamin on Sales* (5th ed.), 142, 143; *Fry on Specific Performance* (6th ed.), sec. 82; *Dexter v. Norton,* 47 N. Y. 62; *Holroyd v. Marshall,* 10 H. L. C. 191; *Tailby v. Official Receiver,* L. R., 13 App. Cases, 523, 543. Compare *In re Wait*

[1927], 1 Ch. 606. So, here the obligation is to deliver a particular chattel, not to deliver any proper chattel. The scrap becomes specific property by reason of its manufacture in a special manner, at a certain plant, by a designated manufacturer, during a given period, and for a single purchaser of the whole quantity produced; and, as soon as the scrap is made, it is ascertained goods, appropriated to the contract by force of its fulfilling the description of the chattel sold through its complete identification with the subject-matter.

Thus the property about which the parties to this appeal bargained is not an undistinguished portion of a quantity of similar goods. *Agri Mfg. Co. v. Atlantic Fertilizer Co.,* 129 Md. 42. From the time the scrap is produced and pressed into bundles, it is identified, and nothing further remains to be done to put it in condition for delivery. This scrap, and none other, is the exclusive subject-matter of the contracts. A sale of a pound of it to a third party is a breach of the contracts; and not until every pound of this scrap— and none other—is delivered to the plaintiffs, is the contract fulfilled.

Under the special circumstances of this case, the scrap sold is "specific or ascertained goods" within the meaning of section 89 of the Sale of Goods Act; and the chancellor was empowered to pass the decree for specific performance. The logic of the facts leads to this conclusion, which was anticipated by eminent authority. 2 *Williston on Sales* (2nd ed.), sec. 601; *Benjamin on Sales* (6th ed.), pp. 165, 1120, 1122; *Fry's Specific Perf.,* sec. 82; *Cassinelli v. Humphrey Supply Co.,* 43 Nev. 208.

For the reasons given, the decree will be affirmed.

*Decree affirmed, with costs.*