**TENNESSEE VALLEY AUTHORITY**

v.

**MASON COAL, INC., a corporation, et al.**

**Civ. No. 3–74–32.**

United States District Court,
E. D. Tennessee, N. D.

March 5, 1974.

On Motion for Permanent Injunction
June 26, 1974.

Robert H. Marquis, Beauchamp E. Brogan, L. Gray Geddie, Jr., Charles W. Van Beke, Div. of Law, Tennessee Valley Authority, Knoxville, Tenn., for plaintiff.

Claude K. Robertson, Fowler, Rowntree, Fowler & Robertson, David E. Smith, Hodges, Doughty & Carson, Foster D. Arnett, Arnett, Draper & Hagood, Knoxville, Tenn., for defendants.

## MEMORANDUM

ROBERT L. TAYLOR, District Judge.

Plaintiff, the Tennessee Valley Authority, seeks a preliminary injunction restraining defendant, Mason Coal, Inc., (hereafter Mason) from selling, delivering, or otherwise disposing of any coal until defendant has first fulfilled its obligations under a supply contract formerly entered into between plaintiff and defendants. Evidence and oral argument were received in support of and in opposition on February 22, 1974. At the conclusion of the hearing on February 22, the Court advised the parties of its preliminary opinion but that a formal opinion would be withheld until a later date.

### Findings of Fact

Plaintiff is a wholly-owned corporation of the United States. 16 U.S.C. § 831 et seq. The Tennessee Valley Authority (hereinafter T.V.A.) currently operates the nation's largest electric power generating system, which serves approximately 80,000 square miles in Tennessee, Kentucky, Mississippi, Alabama, Georgia, North Carolina, and Virginia. Approximately 80 per cent of T. V.A.'s electrical output is generated by coal-burning steam plants which consume more than 35 million tons of coal annually.

Mason is incorporated and principally located in Virginia and has authorized Coal Development Corporation, a Tennessee corporation, as its exclusive sales agent.

In seeking to maintain a constant and reliable coal supply, T.V.A. has entered into numerous long-term contracts with coal producers for the sale and purchase of coal for delivery to T.V.A.'s coal-burning steam plants. The award of these supply contracts is based upon a competitive bid system, requiring the coal supplier to affirmatively represent in his bid that he has the necessary experience and qualifications to produce the requisite quantity and quality of coal.

The inherent nature of the coal industry requires that the supply contracts include various provisions for price adjustments in the product, including changes in mining labor costs and wel-

1110

fare payments; changes in the cost of supplies and materials; changes in applicable state and federal regulations; and costs incurred by the coal company in complying with the Federal Black Lung Benefits Act of 1972. Accordingly, each contract sets forth in detail, including the contract under examination here, provisions for subsequent changes in costs.

The contract provides for an internal disputes procedure to be followed in the event that an adjusted price cannot be reached by the parties. To date, Mason has not submitted any claim for price readjustment under the contract pursuant to the escalation clause. On October 29, 1973, the date on which deliveries were to start under the contract, the agreed price for coal was $8.48 per ton. The energy situation, together with a seller's market, has resulted in November's price of $13.93 a ton. Current figures are unavailable.

On March 16, 1973, T.V.A. issued Regulation No. 25 in which it solicited offers from various coal producers for the sale of coal for use in various steam plants. This invitation set forth in considerable detail various requirements, including coal quality standards for the respective plants, mining plans, reclamation procedures, transport procedures, and price adjustments.

Defendant's bid for a 12-month period to sell to T.V.A. 1,500 tons of coal per week was submitted on August 20, 1973 for public opening on August 21, 1973. Defendant's bid noted the appropriate mode of acceptance:

" . . . If TVA telephones or mails a notice to the bidder within 60 days after the bids are opened that this bid is accepted such acceptance creates a valid and binding contract. If the bidder is awarded a contract he will execute the contract forms attached hereto and will give bond with surety satisfactory to TVA for the faithful performance of the contract promptly after such contract and performance bond forms are filled out by TVA and forwarded to the bidder."

Pursuant to this bid, T.V.A. telephoned acceptance of Mason's bid on October 10, 1973, and thereafter confirmed this oral acceptance in writing by letter dated October 12, 1973, within the 60-day period after the bids were opened.

The parties thereafter agreed to supplement No. 1 on October 26, 1973, which permitted shipments to begin on October 29, 1973. Under the contract's terms, T.V.A. forwarded to Mason a "filled out" contract for the latter's signature. Mason has refused to sign this contract. Defendants delivered more than 4,000 tons of coal but since November 30, 1973 refused to deliver any coal under the contract.

In support of plaintiff's motion for preliminary injunction, it has filed with the Court the affidavit of C. R. Wilkerson, Chief of the Fuels Procurement Branch, Division of Purchasing. Mr. Wilkerson's affidavit is instrumental in aiding the Court's development of a factual setting in which to couch any extraordinary remedy at this preliminary stage. Mr. Wilkerson asserts that a number of economic factors, both inside and outside the coal industry, have led to a sharp decline in coal supplies and a concomitant reduction in T.V.A.'s coal reserves.

"Due to the energy shortage and other factors, an acute shortage of coal supply has developed in those areas serving TVA, and the situation is rapidly becoming critical. Shortages of transportation equipment, mining equipment, explosives, fuels, and roof belts have interrupted deliveries under existing TVA contracts . . . As of July 1, 1973, the John Sevier Steam Plant, the plant to which Mason's coal was being shipped, had a 64-day supply of coal in its stockpile. That stockpile has since dwindled to a 22-day supply in spite of a sharp reduction in generation at this plant in recent months. Coal is urgently needed now for this plant."

Of similar significance in controlling a grant of extraordinary relief at this

stage is the additional remark by Mr. Wilkerson that

" . . . TVA's efforts to purchase coal for the TVA power system, including the John Sevier plant, have had very little success. [To date, only one 500 tons per week proposal has been received by TVA].

\* \* \* \* \* \*

"In summary, TVA has not been able to obtain offers from other sources to offset delivery losses under the Mason Coal contract, much less meet burn requirements and maintain satisfactory stockpiles . . . "

### Conclusions of Law

It is against this factual background that the Court concludes that plaintiff is entitled to extraordinary relief in the form of specific performance. Although the Court is not aided by specific case law in point, it is guided by traditional prerequisites that must be established before specific performance is compelled. Thus, it is generally understood that a federal court in exercising its inherent equity power must conclude prior to compelling performance under a contract that a valid contract exists between the parties, that the obligations under the contract are sufficiently clear, that the subject matter of the contract must be unique in character and, finally, plaintiff's remedies at law are inadequate. See generally, 71 Am. Jur. 13 et seq.

Initially, it should be noted that plaintiff's contention that there was never any formal execution of a binding agreement is misplaced. Thus, the "special nature of the Government contracting has been recognized and it has been held that merger cannot be strictly ap-

plied thereto. The courts have stated that the advertisement, bid, and acceptance constitute the real contract, and that the instrument is merely a reduction to form." Dana Corp. v. United States, 470 F.2d 1032, 1042, 200 Ct.Cl. 200 (1972). Additionally, it should be noted that defendant's bid expressly provided for the appropriate mode of acceptance.[1]

In determining the unique character of this contract, the Court must look beyond the property of the subject matter itself to the surrounding circumstances at the present time. Accordingly, the scarcity of raw fuel materials can make an otherwise common product assume a unique character. The contract here does not provide for the supply of any coal from any source but instead requires with a relatively high degree of specificity the delivery of coal of a specified moisture, ash, sulphur, and heat content. Accordingly, it is generally accepted that specific performance of a contract will be granted where the subject matter is unique, as where the contract calls for specific goods from a specific source. Eastern Rolling Mill Co. v. Michlovitz, 157 Md. 51, 145 A. 378 (1929).

The supply contract under examination here provides for extensive contractual remedies both in the form of standard default procedures and the price escalation clause. In the absence of an alternative source of supply for plaintiff, it would appear that any legal remedies are both impractical and inadequate from plaintiff's standpoint. Texas Co. v. Central Fuel Oil Co., 194 F. 1 (8th Cir. 1912); Southwest Pipe Line Co. v. Empire Natural Gas Co., 33 F.2d 248 (8th Cir. 1929).

1. In a similar vein, defendants question the sufficiency of mutuality of obligation in light of termination provision. *But see*, Goldwasser v. United States, 325 F.2d 722, 163 Ct. Cl. 450 (1963). *Also*, R. Nash & J. Cibinic, Federal Procurement Law at 203 (2d Cd. 1969). The Court does not address itself to the traditional doctrine of mutuality of remedies in light of the traditional principle that the Government cannot be compelled to specific performance under many public contracts by private contractors, but feels at this point that a functionally dispositive distinction can be found in the corporate nature of T.V.A., 16 U.S.C. § 831 et seq., and nonapplicability of this doctrine to federal procurement law.

The fixed price contract with escalation does not guarantee a profit to the contractor. However, an inadequate profit margin does not necessarily constitute an inequitable hardship on defendants as it appears that the price escalation clause adequately protects defendant's financial recovery of increased costs.

In a similar case brought by T.V.A. in the United States District Court for the Western District of Kentucky, Judge James F. Gordon ordered the coal supplier:

"... [T]o begin immediate deliveries of coal to T.V.A. in accordance with the contract provision. ..."

Tennessee Valley Authority v. First Pa. Bank & Trust Co., Civ. No. 2525 (W.D.Ky., November 16, 1950)

Defendant has responded in this action by alleging that plaintiff has failed to make payment to date for delivery of the first 4,000 tons.

### Summary and Conclusion

In conclusion, the Court finds that the contract under preliminary examination is neither inequitable nor one that imposes undue hardships against either party; that plaintiff's legal remedies under the circumstances are inadequate in light of the increased demand in coal, and that the inherent equity power of the Court permits a decree of specific performance.

The Court is also mindful of the various factors that are to be weighed in considering a motion for preliminary injunction, in particular, (a) substantial question, (b) probability of success on the merits, (c) balancing of injuries to parties, (d) and the public interest, which, under the circumstances, is of paramount importance. A continued and reliable supply of coal for the production of electricity is of important concern both to the industrial and private sectors of the region.

Accordingly, the motion is granted, except plaintiff shall be required to make payment to defendants for any amounts presently owing for past delivery of coal under the contract.

A final hearing on the merits shall be appropriately scheduled.

At the prior hearing the Court indicated that mutual bonds would be required from the parties pending a final hearing. In light of Rule 65(c), F.R. Civ.P., such security will not be required.

### MOTION FOR PERMANENT INJUNCTION

This case is again before the Court on the motion of Tennessee Valley Authority (TVA) for a permanent injunction requiring Mason Coal, Inc. (Mason) to supply certain coal for a one-year period. By order entered on March 18, 1974, Mason was directed to begin immediate deliveries under the contract and enjoined from selling its coal to other purchasers until it had first made deliveries to TVA, as required by the contract.

The findings and conclusions made by the Court in its March 5, 1974 memorandum are incorporated by reference in this memorandum.

Oral evidence and arguments of counsel were recently heard in support of and in opposition to the motion. Numerous exhibits and exhaustive briefs were filed. After due consideration, the Court adopts the following findings of fact and conclusions of law.

### Findings of Fact

Mason designated Coal Development Corporation, a Tennessee corporation, as its exclusive sales agent for the contract with TVA. In defining the scope of authority of the exclusive sales agent, the agency agreement provides:

Producer also designates said agent as Producer's attorney-in-fact for the purpose of handling in said agent's name all transactions and relationships with TVA affecting Producer that are related to offering the described coal, including specifically but

without limitation to (1) entering into, amending, or terminating a coal supply contract, (2) complying with contract's reclamation and conservation requirements, (3) settling any claim or dispute, and executing any release, (4) giving and receiving notices, (5) billing for coal furnished, (6) receiving payment for coal furnished, and (7) assigning money due or to become due. [Contract, p. 44].

In order to maintain a continuous and reliable coal supply, TVA enters into numerous long-term contracts with coal producers for the sale and purchase of coal for delivery to TVA's steam plants. TVA mines no coal itself. The award of these coal supply contracts is based upon a competitive bidding system requiring the coal supplier to affirmatively represent in his bid that he has the necessary experience and qualifications to produce the requisite quantity of coal.

The inherent nature of the coal industry requires that such long-term supply contracts include various price adjustments for cost increases during the term of the contract. Accordingly, all TVA contracts, including the contract in this case, contain price escalators for such things as changes in mining costs and welfare payments, changes in costs of supplies and materials, changes in applicable state and federal laws or regulations, and costs incurred by the coal company in complying with the Federal Black Lung Benefits Act of 1972.

The contract provides an administrative procedure by which the coal company may recover these increased costs. In the event the parties cannot agree upon the amount of the price increase, a disputes procedure is provided to settle these differences administratively. Although contending that its costs have increased, Mason Coal has filed no such claim with TVA.

In response to TVA's Invitation to Bid dated March 16, 1973 (Requisition No. 25), Mason Coal, Inc., submitted a bid to be opened at TVA's public bid opening at 10 a. m. on August 21, 1973.

In its August 1973 bid, Mason Coal offered to sell TVA 1,500 tons of coal per week of a certain quality, from an identified mine, from a specific coal seam, and of a particular size at a price of $8.-48 per ton for a period of 12 months.

Other coal companies also made bids in response to Requisition No. 25. The sealed bids of all coal companies who responded to the invitation were opened in accordance with the bid procedure on August 21, 1973. The price per ton offered by Mason Coal was comparable with other bids received from the Southwest Virginia area, where the Mason Coal mine is located. As a part of Mason Coal's bid, the American Employers' Insurance Company, through its authorized agent, affirmatively represented to TVA that it would issue a surety supply bond in the amount of $18,750 if a contract was awarded to Mason Coal.

Upon completion of the bid evaluation, the TVA Board of Directors, on October 5, 1973, approved the awarding of Contract No. 74P–25–T14 to Mason Coal, Inc., on the basis of its bid, thereby rejecting a number of other bids. TVA notified Mason Coal that its bid had been accepted and the contract was awarded to it by telephone on October 10, 1973, and was confirmed by letter dated October 12, 1973. This mode of acceptance conforms with the procedures prescribed in Mason's bid documents, which provide:

> If TVA telephones or mails a notice to the bidder within 60 days after the bids are opened that this bid is accepted such acceptance creates a valid and binding contract. If the bidder is awarded a contract he will execute the contract forms attached hereto and will give bond with surety satisfactory to TVA for the faithful performance of the contract promptly after such contract and performance bond forms are filled out by TVA and forwarded to the bidder. [Contract, p. 34]

The acceptance of such bid by TVA in the manner specified created a valid,

binding, and enforceable contract between TVA and Mason.

After the contract had thus been awarded, TVA and Mason Coal, through Mason's exclusive sales agent, Coal Development Corporation, agreed to Supplement No. 1 to the contract, which provided for Mason Coal to begin early deliveries to be used at TVA's John Sevier Steam Plant. Supplement No. 1 was formally executed for Mason Coal on October 26, 1973.

Mason Coal delivered more than 4,000 tons of coal to TVA under the contract from October 29, 1973 to November 30, 1973. At that time Mason Coal halted all coal deliveries to TVA and began selling the coal to other purchasers. Mason Coal also refused to sign and return the "filled out" contract or the performance bond which had been issued by the American Employers' Insurance Company.

Due to the energy shortage and other factors, an acute shortage of coal supply has developed in those areas serving TVA, and the situation has, and is, rapidly becoming critical. Shortages of transportation equipment, mining equipment, explosives, fuel, and roof bolts have interrupted deliveries under existing TVA contracts. These problems, together with the extreme difficulty in purchasing additional coal has resulted in a rapid depletion of TVA's coal stockpiles, which are already below acceptable levels. As of July 1, 1973, the John Sevier Steam Plant, the plant to which Mason's coal was being shipped, had a 64-day supply of coal in its stockpile. That stockpile has since dwindled to a 30-day supply. TVA has been able to maintain this level of inventory only because the plant has been operating at one-third of its load capacity. The plant has been completely shut down for more than 30 days this calendar year due to a lack of coal; it is currently not operating, and will not start up again until May 25, 1974. Coal is urgently needed now for this plant in order for TVA to meet the increased power loads this summer.

TVA's efforts to buy additional coal for the TVA power system, including the John Sevier Plant, have been unsuccessful. TVA has been unable to obtain offers from other sources to offset delivery losses under the Mason Coal contract, and therefore has no adequate remedy at law.

By order of March 18, 1974, the Court ordered Mason Coal to begin immediate coal deliveries under the contract to TVA, and preliminarily enjoined defendants from selling their coal to others until they had made the required deliveries to TVA pending final disposition of the case.

■ A valid contract exists between Mason Coal, Inc. and TVA and the public interest will suffer irreparable injury if the contract is not performed according to its terms. TVA is entitled to specific performance of the contract.

TVA is the sole source of electric power for more than six million people living in an 80,000 square mile, seven-state area. It is absolutely essential that TVA maintain an adequate and reliable coal supply for its generating plants.

The contract involved is in no sense a contract for the purchase of coal generally. On the contrary, the contract specifically calls for delivery of 1,500 tons of coal per week mined by Mason, from a specified mine, from a specified coal seam, of a specified quality (moisture, ash, sulphur, and heat content) and of certain size pieces of coal. The contract provides that:

Coal shall not be delivered in any other quantities, of any other size or quality or from any other source or mined by any other producer or subcontractor unless authorized by TVA in writing prior to delivery.

The contract is neither inequitable nor imposes undue burdens on defendants, especially in light of the price escalation provisions. TVA has been unable to purchase adequate replacement coal, and money damages in any amount would not be an adequate remedy. TVA and

the people of this region simply have to have coal. To permit defendants to ignore their contractual obligations and reap windfall profits as a result of the current coal shortage in this region is wrong. Moreover, the precedent that would be created would encourage others to ignore their obligations resulting in catastrophe. TVA would then be unable to obtain the required coal to supply electricity to this region.

### Conclusions of Law

The Court's memorandum opinion entered herein on March 5, 1974, holding that a valid contract existed between the parties and ordering specific performance of that contract is hereby reaffirmed and incorporated herein by reference.

Defendants' contention that the contract is invalid because the contract was never formally executed is without merit. The court in Wagar Lumber Co. v. United States, 181 F.Supp. 388 (W.D. Wash.1960), dismissed a similar contention saying:

> Where the government follows a procedure of advertising for and receiving bids, one of which is accepted, and thereafter presents formal written contracts for execution by the parties, it is well settled that the contract is effected when the successful bidder has been notified of his award, all subsequent steps being merely formal or ministerial. See Garfielde v. United States, 1876, 93 U.S. 242, 23 L.Ed. 779 and United States v. Purcell Envelope Co., 1919, 249 U.S. 313, 39 S.Ct. 300, 63 L.Ed. 620 [p. 390].

181 F.Supp. at 390.

"The courts have stated that the advertisement, bid, and acceptance constitute the real contract, and that the instrument is merely a reduction to form." Dana Corp. v. United States, 470 F.2d 1032, 1042, 200 Ct.Cl. 200 (1972). Mason's bid specifically states the mode of acceptance and TVA's acceptance was in full accord with Masons's bid.

The contract between TVA and Mason Coal, Inc., is governed by federal law, not the laws of the State of Tennessee. United States v. Seckinger, 408 F. 2d 146 (5th Cir. 1969), rev. on other grounds, 397 U.S. 203, 90 S.Ct. 880, 25 L.Ed.2d 224 (1970); United States v. McCabe Co., 261 F.2d 539 (8th Cir. 1958); Rainwater v. United States, 356 U.S. 590, 78 S.Ct. 946, 2 L.Ed.2d 996 (1958). TVA is an "arm of the [federal] government" and an agency performing wholly governmental services. Ramsey v. United Mine Workers of America, 27 F.R.D. 423 (E.D.Tenn.1961); Knickerbocker v. Tennessee Valley Authority, 348 F.Supp. 230 (E.D.Ill.1969); Tennessee Valley Authority v. Kinzer, 142 F.2d 833 (6th Cir. 1944).

Defendant's contention that the contract is invalid because the amount and method of the payments to be paid by TVA for Black Lung compensation coverage and other price adjustments were not agreed upon is unsupported in fact and law. Price-adjustment clauses such as these are standard features in long-term government supply contracts, Nash & Cibinic, Federal Procurement Law, p. 293 (2d Ed. 1969), and their validity has been sustained on many occasions. See, for example, the many cases collected in Annot., 63 A.L.R.2d 1337 (1959), such as Cub Fork Coal Co. v. Fairmount Glass Works, 33 F.2d 420 (7th Cir.), cert. den. 280 U.S. 601, 50 S. Ct. 82, 74 L.Ed. 646 (1929); Department of Water and Power v. Okonite-Callender Cable Co., 181 F.2d 375 (9th Cir. 1950). The contract herein specifically provides the method of ascertaining payment for such costs and the method by which the contractor may recover them.

By shipping coal under the contract, defendants recognized the validity of the contract. See Union National Bank v. Fox, 24 Tenn.App. 664, 148 S.W.2d 381 (1940); Frierson v. International Agricultural Corp., 24 Tenn.App. 616, 148 S. W.2d 27 (1940). See also, 28 Am.Jur.2d Estoppel and Waiver § 59 (1966).

▇ Specific performance of a contract will be granted where the subject matter of the contract is unique, as where the contract calls for specific goods from a specific source, Eastern Rolling Mill Co. v. Michlovitz, 157 Md. 51, 145 A. 378 (1929), or where there is no adequate remedy at law, such as where the goods cannot be purchased elsewhere. Texas Co. v. Central Fuel Oil Co., 194 F. 1 (8th Cir. 1912); Southwest Pipe Line Co. v. Empire Natural Gas Co., 33 F.2d 248 (8th Cir. 1929).

▇ Specific performance will also be granted to protect the public interest. Virginian Ry. v. Federation, 300 U.S. 515, 57 S.Ct. 592, 81 L.Ed. 789 (1937); Yakus v. United States, 321 U.S. 414, 64 S.Ct. 660, 88 L.Ed. 834 (1944); Porter v. Warner Co., 328 U.S. 395, 66 S.Ct. 1086, 90 L.Ed. 1332 (1946); United States v. Morgan, 307 U.S. 183, 59 S.Ct. 795, 83 L.Ed. 1211 (1939).

▇ The Court has jurisdiction over Mason Coal, Inc., through service of process on its exclusive sales agent Coal Development Corporation in accordance with Rule 4.04(4) of the Tennessee Rules of Civil Procedure. Tennessee law provides in pertinent part:

> Persons who are non residents of Tennessee . . . are subject to the jurisdiction of the courts of this state as to any action or claim for relief arising from:
>
> "(a) The transaction of any business within the state;
> \* \* \* \* \* \*
>
> " 'Person' as used herein shall include corporations and all other entities which would be subject to service or process if present in this state. *Any such person shall be deemed to have submitted to the jurisdiction of this state who acts in the manner above described through an agent or personal representative.*" (Emphasis added)

4 Tenn.Code Ann. § 20–235 (Cum. Supp.1973)

Mason Coal's actions come within the meaning of this statute. Southern Machine Co. v. Mohasco Industries, Inc., 401 F.2d 374 (6th Cir. 1968); Temco, Inc. v. General Screw Products, Inc., 261 F.Supp. 793 (M.D.Tenn.1966); Beal v. Caldwell, 322 F.Supp. 1151 (E.D.Tenn. 1970).

▇ Defendants contend that this Court lacks jurisdiction over the portion of this action seeking equitable relief affecting real property located beyond the Court's jurisdiction. An action for specific performance is by nature a proceeding in personam. Once the court acquires jurisdiction over the person of the defendant, it may decree specific performance of a contract affecting an interest in land located in another state or even another country. 71 Am.Jur.2d Specific Performance § 185 (1973); Johnson v. Kimbro, 40 Tenn. 557, 3 Head 557 (1859).

The Court finds that a valid contract exists between Mason Coal, Inc. and TVA; that this contract is neither inequitable nor one that imposes undue hardships on either party; that plaintiff has no adequate remedy at law; and that the preliminary injunction heretofore entered by the Court should be and it hereby is made permanent.

The motion for an injunction against American Employers' Insurance Company, the alleged surety on Mason's bond, is denied. TVA will have its recourse for appropriate relief against American if Mason fails to comply with its contract.