MASON COAL, INC.

v.

TENNESSEE VALLEY AUTHORITY.

Civ. No. 3–81–324.

United States District Court,
E. D. Tennessee, N. D.

Oct. 21, 1981.

J. Edward Ingram, Knoxville, Tenn., Joseph E. Wolfe, Norton, Va., for plaintiff.

Herbert S. Sanger, Jr., Gen. Counsel, Justin M. Schwamm, Sr., Melvin L. Harper, Brent R. Marquand, Tennessee Valley Authority, Knoxville, Tenn., for defendant.

### MEMORANDUM

ROBERT L. TAYLOR, District Judge.

Mason Coal, Inc. (Mason) brought this action in the United States District Court for the Western District of Virginia, Big Stone Gap Division, against the Tennessee Valley Authority (TVA) seeking to set aside or amend a Hearing Officer's final administrative decision rendered pursuant to the *Disputes* provision of a contract between the parties. Chief Judge James C. Turk transferred the action to this Court because the "Eastern District of Tennessee has already become familiar with the complex details of this case through prior litigation...," and because the operative facts arose in this District.

This Court's familiarity with this litigation began in 1974 when we ordered specific performance of a coal supply contract between Mason and TVA. *Tennessee Valley Authority v. Mason Coal, Inc.*, 384 F.Supp. 1107, aff'd 513 F.2d 632 (6th Cir. 1975). The contract provided that Mason would sell and TVA would buy 75,300 tons of coal of a guaranteed quality to be delivered at the rate of approximately 1,500 tons per week. By Supplement 1 to the contract the parties scheduled deliveries to begin October 29, 1973 and to conclude October 28, 1974. (Vol. V, Ex. 14).

Most of the facts surrounding this protracted litigation are not in dispute. The facts as they had developed through June, 1974 appear in this Court's prior decision granting specific performance. We noted then that

> The inherent nature of the coal industry requires that such long-term supply contracts include various price adjust-

ments for cost increases during the term of the contract. Accordingly, all TVA contracts, including the contract in this case, contain price escalators for such things as changes in mining costs and welfare payments, changes in costs of supplies and materials, changes in applicable state and federal laws or regulations, and costs incurred by the coal company in complying with the Federal Black Lung Benefits Act of 1972.

The contract provides an administrative procedure by which the coal company may recover these increased costs. In the event the parties cannot agree upon the amount of the price increase, a disputes procedure is provided to settle these differences administratively. Although contending that its costs have increased, Mason Coal has filed no such claim with TVA.

384 F.Supp. at 1113. Mason filed a claim for a price increase (a gross inequity claim) on June 20, 1974 pursuant to section 8 of the contract. That section provides in pertinent part that

> any gross inequity that may result from unusual economic conditions not contemplated by the parties at the time of execution of the contract may be corrected by mutual agreement. In case of a claim of gross inequity each party shall furnish the other with any pertinent information requested. The existence of a claim of inequity or failure of the parties to reach an agreement with respect thereto shall not relieve contractor from the obligation to continue delivery of coal hereunder . . . .

The claim covered the period March 5 through May, 1974 during which Mason had been delivering coal pursuant to this Court's preliminary injunction issued March 5, 1974. (Vol. VII, Ex. 60). In March, 1975 a price adjustment was granted, but in an amount smaller than Mason had requested. (Vol. VII, Ex. 61). Mason reserved its position that no valid contract existed and/or that the contract had expired on October 29, 1974. The parties agreed to hold all

administrative remedies in abeyance pending the outcome of Mason's appeal. (Vol. V, Ex. 21, 22). The United States Court of Appeals for the Sixth Circuit affirmed this Court's injunction on April 22, 1975 and on July 25, 1975 TVA requested that Mason submit rescheduled deliveries. (Vol. V, Ex. 20). Mason did not and again asserted that the contract had expired by its own terms in October, 1974. It also argued that TVA's claim was not timely and that any obligation that it might have had was terminated by the parties' failure to resolve the gross inequity claim. Mason also claimed that performance was impossible because the mine had been closed due to adverse conditions. (Vol. V, Ex. 23). Consequently, on September 12, 1975, pursuant to section 5 of the contract's Terms and Conditions, TVA found Mason in breach of the contract and terminated its right to make further deliveries. TVA also informed Mason that it would procure the undelivered coal for Mason's account. (Vol. V, Ex. 24).

Mason requested a Contracting Officer's decision. The Contracting Officer upheld TVA's termination of Mason's right to make further deliveries and the settlement of Mason's gross inequity claim. He found that Mason owed TVA the net amount of $153,127.72 because of the reprocurement of coal to replace that which Mason failed to deliver. (Vol. V, Ex. 19).

Mason appealed the decision of the Contracting Officer to TVA's General Manager who appointed Professor Richard S. Wirtz of the University of Tennessee College of Law to decide the appeal. Professor Wirtz held a four-day evidentiary hearing on March 21–24, 1977. (Vol. II, III). On June 7, 1978 he filed his decision holding that Mason was entitled to a price increase of $7,191.23 on its gross inequity claim instead of the $3,273.84 which TVA had allowed in Supplement 9 to the contract. (Vol. V, Ex. 14). He determined that Mason had an unexcused deficiency of 24,757 tons of coal and awarded TVA $165,129.19 as its excess cost of reprocuring coal to fill the contract.

After adjustments, TVA was awarded $158,592.83.[1]

Our scope of review in this case is governed by the *Disputes* clause found at section 11b of the Terms and Conditions of the Contract:

> The decision of the General Manager or his representative or representatives shall be final and conclusive upon the parties except on questions of law or unless determined by a court of competent jurisdiction to have been fraudulent or capricious or arbitrary or so grossly erroneous as necessarily to imply bad faith, or not supported by substantial evidence....

Thus, our review is limited to the questions of law presented and to whether the Hearing Officer's decision was capricious, arbitrary, grossly erroneous or not supported by substantial evidence. *Crass v. Tennessee Valley Authority*, 460 F.Supp. 941 (E.D. Tenn.1978), *aff'd* 627 F.2d 1089 (6th Cir. 1980).

■ Mason challenges the decision of the Hearing Officer on six grounds, only one of which has been briefed. First, Mason contends that TVA lacked the right and power to make a deficiency assessment and reprocurement more than nine months after expiration of the contract. There is no merit in this contention. That the matter was not referred to the Contracting Officer until after the original time set for the required deliveries is not significant. The matter was nevertheless to be resolved according to the *Disputes* clause of the contract. *Tennessee Valley Authority v. U. S. Carbon Products, Inc.*, 427 F.Supp. 474 (E.D.Ill.1976). Moreover, all administrative remedies available to both parties were stayed until the appeal was decided. (Vol. V, Ex. 21, 22). It was, therefore, unavoidable that the matter was not referred to the Contracting Officer until after the original time for performance had passed.

■ Second, Mason claims that TVA failed to follow the reprocurement procedure specified in the contract, failed to spe-cifically reprocure coal for the deficiencies in the contract and failed to offer any proof of damage proximately resulting from plaintiff's failure to perform. Mason has briefed this point. The cover and reprocurement procedures embodied in the contract are found at sections 5d and 5e of the Terms and Conditions and provide in pertinent part that:

> ... TVA may at its option within a reasonable time after the expiration of the contract, or TVA's refusal to accept further deliveries or TVA's termination of the Contractor's right to make further deliveries as provided for herein, purchase in the open market or by contract or otherwise procure coal to replace all or any part of that which the Contractor has failed to deliver or that which its right to deliver was suspended or terminated, except as provided in paragraph (c), the Contractor shall be liable to TVA for the excess cost occasioned by such purchase and any other loss or damage caused by the Contractor's breach of the contract, including but without limitation to, liability incurred by TVA with respect to the transportation or other handling of the coal. TVA may deduct such excess costs from any amount otherwise due the Contractor.

> e. Unless TVA notifies the Contractor in writing that replacement coal will be obtained in some other manner, such part of the highest priced coal (under one or more contracts) which TVA purchases at the next awarding of term coal contracts for delivery at the same steam plant as is required to replace Contractor's deficiency at the time of such awarding shall be deemed to have been purchased as replacement coal for the Contractor's account.

In September, 1975, when TVA purchased replacement coal to fill the Mason contract, the standard procedure was not that described in section 5e; rather, replacement coal was the highest priced coal purchased

---

1. As TVA points out in its brief, the Hearing Officer transposed a figure in calculating the amount due TVA. This caused him to find that TVA was due $158,662.13 rather than the correct amount of $158,592.83.

at the next awarding of coal contracts, term or spot, for any plant in the system. (Vol. II, 65–76). The Hearing Officer made the following conclusions of law concerning TVA's reprocurement of coal:

(16) Had TVA invoked Sections 5d and 5e in October-November, 1974, as it had the right to do, Mason would now be liable to TVA on each ton for the difference between the contract price and $36.52. TVA opted, however, to pursue the remedy of specific performance, on the assumption (later proven unwarranted) that if the Sixth Circuit affirmed Judge Taylor's injunction, Mason would send coal.

(17) TVA in fact invoked Sections 5d and 5e in September 1975, after it finally became clear that Mason would not fulfill the contract. The coal obtained as replacement coal on this contract pursuant to TVA's then current standard procedures, as TVA notified Mason in writing in the Contracting Officer's Decision, cost TVA an average of $19.18/ton, after adjustments in price for difference in quality. (See Finding 47.) I conclude that the figure of $19.18/ton for replacement coal is the correct figure to be used in determining Mason's liability to TVA under Section 5d for excess cost.

Decision at 28–29. In Finding 47 he explained how TVA identified its coal purchases to replace Mason's undelivered coal and what adjustments were made to the price of the replacement coal. The use of a cost figure of $19.18 resulted in an excess replacement cost of $165,129.19 before adjustments. Had TVA used the replacement procedure set forth in section 5e, Mason's liability for excess cost would have been $292,179.80; coal was then selling at an adjusted cost of $24.69 per ton. (Vol. VI, Ex. 36). Clearly, Mason benefited from TVA's using the procedure it did rather than that set forth in section 5e.

■ Mason contends that the procedure used by TVA did not comply with the Federal Property and Administrative Services Act, 41 U.S.C. § 251 et seq. and its implementing regulations. Under 40 U.S.C.

§ 474(12), TVA's acquisitions are not covered by the Act. However, TVA is directed to coordinate its policies with the requirements of the Act to the "maximum extent that it may deem practicable." The Board of Directors of TVA has determined by resolution that the procedures under the Act are not practicable. (Vol. V, Ex. 15). There is, therefore, no merit in this contention.

■ Mason also contends that TVA should have assessed its replacement costs by using TVA's spot purchases for the John Sevier plant where the coal was to be used, rather than using coal purchased for use at any plant in the system. Mr. John W. Thompson, Chief of the Fuel Procurement Branch, testified that at any given time there may be 70 active coal contracts to supply the 12 coal-fired plants in the TVA system. He explained that TVA used the method described above because the purchases are in reality purchases for the system as a whole, i.e. TVA can reduce generation at a plant where the coal inventory is low and increase it at another where the inventory is high. Because of this integrated system, TVA uses a system-wide procedure for procuring replacement coal. (Vol. II, 66–68). In the opinion of the Court, TVA acted reasonably in its coal purchases and in calculating the cost of replacement coal. It went beyond the terms of the contract and reduced Mason's ultimate liability by $136,411.07. We agree with the Hearing Officer that the method used by TVA to identify replacement coal to cover Masons' deficiency was "eminently fair to Mason." Decision at 30.

■ Mason contends in ground three that the Hearing Officer erred by requiring that a gross inequity claim be supported by audited accounting statements. In ground four, which is related, Mason asserts that the method used to calculate its gross inequity claim is contrary to the law, the contract and equity. Neither of these contentions has merit. The amount to be allowed for Mason's gross inequity claim was a question of fact to be determined by the Hearing Officer. Mason's case on its gross

inequity claim was presented through one witness, its attorney, which is very unusual. He offered into evidence an unaudited monthly cost statement prepared by Mason's accountant. (Vol. III, 4/1–58). The accountant did not testify, although leave was granted to supplement the record with his testimony. Mr. James Edgar testified on behalf of TVA. He explained in detail how he used information supplied by Mason to calculate the amount which should be allowed for the gross inequity claim. (Vol. III, 4/16–113). The Hearing Officer saw and heard the witnesses and reviewed the exhibits. He found that Mr. Edgar was a credible witness and that his calculations were supported by reliable data. Contrary to Mason's assertion, the Hearing Officer did not require an audited financial statement. He simply found Mason's unaudited statements presented by its attorney to be less convincing than TVA's case. His finding of $7,191.23 for the gross inequity adjustment is supported by substantial evidence.

■ Mason's fifth contention is that the Hearing Officer misconstrued the "designated source" and "risk of source" provisions of the contract. The record shows, and the Hearing Officer found, that coal was delivered to TVA from three entries into a seam in the Mason mine. In July, 1974 Mason was required by mine inspectors to offset a fan and to obtain a separate license for the third entry. Mason then claimed that the third entry was a separate mine and was not the designated source in the contract. Relying on these arguments, Mason refused to deliver any more coal from the third entry. (Vol. III, 3/78–83). The Hearing Officer found that all parties had treated the third entry as part of the designated source in the contract. He concluded that the parties' interpretation of the contract was decisive and that therefore the third entry was part of the designated source. We agree. The construction given to the contract by the parties before it became the subject of dispute is entitled to great weight. *Petrofsky v. United States*, 488 F.2d 1394, 1402, 203 Ct.Cl. 347, (1973); *Pacific Far East Line, Inc. v. United States*,

394 F.2d 990, 996 n.8, 184 Ct.Cl. 169, (1968). We, therefore, hold that the third entry was a part of the designated source in the contract and under section 5c of the Terms and Conditions of the contract Mason assumed the risk that the designated source would not produce sufficient coal to complete the contract.

■ Mason's final contention is that the Hearing Officer erred in disallowing Mason's quarterly price adjustments to the date of reprocurement in computing excess reprocurement costs. This contention is without merit. The Hearing Officer held that Mason was not entitled to automatic price adjustments after December 31, 1974, the date when the coal should have been delivered. His reasoning was that TVA should not be held liable for costs incurred because of Mason's unjustified delay in performing its obligations under the contract. We adopt the reasoning of the Hearing Officer. Mason should not be allowed to reduce its liability by increasing its contract price because of changes in the general price level during a time period when it was not attempting to perform under the contract.

At the conclusion of Professor Wirtz's thorough opinion he states that "the record shows [that TVA] conducted all of its dealings with this defaulting contractor fairly and conscientiously, with due regard to the interests of those for whose benefit it buys and burns coal." Decision at 33. Having reviewed the entire administrative record the Court is of the same opinion.

For the reasons stated, it is ORDERED that TVA's motion for judgment on the pleadings be, and the same hereby is, granted. It is further ORDERED that Mason's claim be, and the same hereby is, dismissed. It is further ORDERED that judgment enter in favor of TVA on its counterclaim in the amount of $158,592.83 plus statutory interest and costs.

Order accordingly.